HERMAN H. HARR AND BLANCHE HARR, HIS WIFE, PLAINTIFFS-APPELLANTS AND CROSS-RESPONDENTS, v. ALLSTATE INSURANCE COMPANY, DEFENDANT-RESPONDENT AND CROSS-APPELLANT.

Argued December 17, 1968—Decided June 30, 1969.

Mr. *Allan Maitlin* argued the cause for plaintiffs-appellants and cross-respondents (*Messrs. Feuerstein and Sachs,* attorneys; *Mr. Maitlin,* of counsel).

Mr. *Louis Ruprecht* argued the cause for defendant-respondent and cross-appellant (*Messrs. Gaffey, Webb and McDermott,* attorneys).

The opinion of the court was delivered by

HALL, J. This is an action against an insurer to recover for water damage to certain business merchandise stored in the basement of plaintiffs' dwelling. Their theory is that, although neither a homeowner's policy nor a fire insurance policy issued by defendant covered the peril causing the loss, the insurer is estopped to deny coverage under the fire policy by reason of a contrary representation made by its agent and relied on by plaintiffs to their detriment.

The trial court, sitting without a jury, granted defendant's motion for involuntary dismissal at the end of plaintiffs' proofs as to liability, holding that in a suit at law, as distinct from an action in equity to reform a policy, statements made by the insurer's agent at the inception of the contract, which had been received in evidence, could not be considered to broaden the coverage of the policy because of the parol evidence rule. The Appellate Division affirmed, 99 *N. J. Super.* 90 (1968), although on a different basis. It decided that a defense of non-coverage could be barred by the doctrine of equitable estoppel on appropriate facts, in which event the parol evidence rule would be irrelevant. It found, however, upon exercise of its fact-finding appellate jurisdiction, that there was insufficient proof both of representation of coverage by the agent and of reliance by plaintiffs.

We granted both parties' petitions for certification. 52 *N. J.* 165 (1968). That on behalf of defendant was aimed

not only, out of an excess of caution, to preserve its right to argue against the view of the Appellate Division that an insurer may be estopped to deny coverage, but also to review the affirmance some time ago by the Appellate Division, in an unreported opinion, of an interlocutory ruling of the trial court, granting plaintiffs' motion to strike the defense that the suit was not commenced within the statutory 12 month period of limitation.

 The evidence adduced on plaintiffs' behalf consisted of the two insurance policies and the rather sparse testimony of plaintiff Herman Harr. Since the propriety of a judgment of involuntary dismissal is involved, we must accept as true all evidence which supports the position of the party against whom the motion was made and must give him the benefit of all favorable inferences which may logically and legitimately be drawn therefrom. *O'Donnell v. Asplundh Tree Expert Co.,* 13 *N. J.* 319, 328 (1953). So viewed, we think plaintiffs' proofs, along with stipulations at trial and in the pretrial order, fairly showed the following:

Mr. Harr was in the business of selling and servicing beer and soft drink dispensing equipment and for some years had conducted that business from his home in Essex Fells. In connection with it, he stored in the basement mixing valves, refrigeration equipment, regulators, syrup tanks, cooling plates and the like for replacement parts. In the middle of January 1963, he went to Florida for a vacation and was away from home six or seven weeks. During February a water pipe in the basement of the house burst, cascading some 90,000 gallons of water through that area, and seriously damaging the structure, certain household and personal effects, and the stored merchandise. A claim was made upon the defendant for the entire loss, and it finally paid $12,062.13 under the homeowner's policy for damage to the building and the household and personal effects, but denied liability under either policy for damage to the merchandise on the ground of non-coverage.

In 1961 Mr. Harr had changed insurance agents and, to replace a homeowner's policy that was expiring in another company, procured a similar contract from defendant through a Mr. Meinsohn, who, it was stipulated, was its agent.[1] The policy is in the usual form of such contracts, insuring the dwelling and personal property "usual or incidental to the occupancy of the premises as a dwelling" as to many perils causing physical damage. Included as well is protection against theft, and coverage with respect to comprehensive personal liability and medical payments. The document is an exceedingly complex one comprising many finely printed pages which deal with the perils insured against, limitations and conditions. The policy is so arranged and worded that a homeowner, not expert in insurance matters, could not be expected to appreciate all its provisions. However, we need not be concerned with problems which might conceivably arise in connection with such contracts, since Mr. Harr admitted that he knew the policy did not cover his business merchandise and since it is not claimed that the agent made any contrary representations with respect thereto.[2] It is also logically inferable, even though he was not questioned specifically about it, that he knew damage resulting from bursting water pipes, to property covered by the policy, was included in the insured perils.

[1] Meinsohn countersigned both policies for defendant as "authorized agent". It is our understanding that defendant does not write insurance through so-called "independent" agents but rather does business only by its own employees. Consequently we assume that Meinsohn was defendant's employee. This probably accounts for the fact that suit was not also brought against him individually, as is quite customary where the agent is an "independent" one and thus can be said to have the dual capacity of a broker for the prospective insured at the same time. Here plaintiffs had no broker.

[2] Plaintiffs did make a claim for recovery under the homeowner's policy in this action on the theory that the quoted language as to personal property coverage should be deemed, under the circumstances, to include the business merchandise as well. The trial judge properly held to the contrary and the point has not been pursued since.

The day before Mr. Harr left for Florida in January 1963, he telephoned Mr. Meinsohn and asked whether he could "cover" the merchandise in the basement, which he described, in the amount of $15,000. Meinsohn replied that he would find out and would call plaintiff back. He did so the same day and, according to Harr's testimony, Meinsohn said "Mr. Harr, we can cover you for $7,500 and you are *fully covered*. Go to Florida * * * and have a good time." (Emphasis supplied). Mr. Meinsohn told him the amount of the premium and asked for a check, which was immediately sent. Harr did not receive the contract — the fire insurance policy previously referred to — before he left for Florida, but testified that he took Meinsohn's word that he was "fully covered" because "I felt I had confidence in him."

There is nothing in the evidence to indicate that the two men discussed or even mentioned what perils the policy insured against. Mr. Harr was not asked, as he might well have been, what he expected or what he understood was meant by Mr. Meinsohn's assertion that he was "fully covered". We think it a fair inference, however, that he would expect, and reasonably so, coverage for the same perils of physical damage included in the homeowner's policy, and that he could justifiably construe "fully covered" as so indicating.[3] We further believe that Mr. Meinsohn should be held to have understood that his use of the phrase "fully covered" would convey that impression to Mr. Harr, in absence of an express statement by him that this peril was not covered, since he had written the homeowner's policy and also must be said to realize that the possibility of water damage from bursting

---

[3] At the trial plaintiffs offered to prove, as we understand it, that they previously held an insurance policy in another company covering the basement merchandise which protected against water damage. Defendant's objection was sustained, erroneously we think. The proof was admissible to negative any contention that no insurer would write this particular risk and to show that plaintiffs could have obtained the protection from another source if defendant had made known to plaintiffs that it would not.

pipes to personal property in a basement is a common peril against which protection would be desired and expected.

The fire insurance policy, when actually issued, was dated January 30, 1963, effective January 15 of the same year, and was mailed to Mr. Harr at his Essex Fells address on or after the first mentioned date. His mail was forwarded to Florida and he received the policy there sometime later. He testified that he read it subsequently, "but I couldn't tell you offhand what it really said in there." He was not asked whether his reading was before or after he learned of the damage or whether he understood from the reading that damage from bursting water pipes was not covered.

The fire policy, while not as lengthy as the homeowner's contract, would nevertheless be confusing and abstruse to the average person. The heading "Fire Insurance Policy" is itself something of a misnomer these days, when almost all such contracts, including this one, insure against, and are generally known to cover, some additional perils. The general insuring clause on the first page insures " * * * against all Direct Loss by Fire, Lightning and by Removal from Premises Endangered by the Perils Insured Against In this Policy, Except as Hereinafter Provided." Confusion as to coverage begins with the next sentence, which reads

"INSURANCE IS PROVIDED AGAINST ONLY THOSE PERILS AND FOR ONLY THOSE COVERAGES INDICATED BELOW BY A PREMIUM CHARGE AND AGAINST OTHER PERILS AND FOR OTHER COVERAGES ONLY WHEN ENDORSED HEREON OR ADDED HERETO".

There follows a number of lines under the caption "ITEMS INSURED", which here were completed only as to "CONTENTS $7,500", described by the written words "Merchandise in storage". (An enigmatic endorsement affixed to the policy reads "PERMISSION GRANTED TO STORE A SMALL QUANTITY OF MIXING VALVES IN THE

DWELLING, IT BEING AGREED AND UNDERSTOOD THAT THERE IS NO SALES ROOM.") Below the "ITEMS INSURED" lines are another set of lines, captioned "PERIL(S) INSURED AGAINST AND COVERAGE(S) PROVIDED," which reads as follows:

```
 RATE PREMIUMS
 FIRE AND LIGHTNING
 EXTENDED COVERAGE
 [ ] ADDITIONAL EXTENDED COVERAGE
 [ ] BROAD FORM (Other Perils)
 SPECIAL FORM (Other Perils)
```

In this policy, rate and total premium were inserted only with respect to the first two lines, indicating coverage, insofar as premium is concerned, only as to those categories. "EXTENDED COVERAGE" was not, however, in any way defined on this page.

The remainder of the policy consists on the second page of the 165 lines required in all fire insurance contracts by statute, N. J. S. A. 17:36–5.20, which have no pertinency here, and an attached sheet, finely printed on both sides, entitled at the top "HOUSEHOLD CONTENTS FORM" and designated at the bottom as "F. I. R. O. [Fire Insurance Rating Organization; see N. J. S. A. 17:29A–1, et seq.] — N. J. Form 203 — Edition December 1959." The front side of this attached sheet consists of many detailed provisions relating to additional coverages, limitations and conditions. The back side is captioned "EXTENDED COVERAGE ENDORSEMENT NO. 4 — PERILS OF WINDSTORM, HAIL, EXPLOSION, RIOT, RIOT ATTENDING A STRIKE, CIVIL COMMOTION, AIRCRAFT, VEHICLES, SMOKE, EXCEPT AS HEREINAFTER PROVIDED" and sets forth numerous technical provisions relating to these perils.

The only reference to bursting water pipes is a negative one, found in similar language on both sides of the sheet

in the paragraphs defining losses covered by explosion. It is stated that rupture or bursting of water pipes is not an explosion within the intent and meaning of the explosion provisions. Ambiguity arises, however, because another paragraph in the extended coverage endorsement entitled "WATER EXCLUSION CLAUSE" declares that the company shall not be liable for loss occasioned by various specified kinds of water occurrences (unless loss by fire or explosion ensues) and water from bursting pipes is not listed as one of the excluded occurrences. A person could conceivably believe that loss from other water occurrences, including bursting pipes, was covered. While thorough examination of all the attached sheet provisions convinces us that there is no coverage in such event, we do not believe that the average person, if he could struggle through the fine print and uncommon verbiage, could reasonably be said to be so alerted.[4]

I

We will deal first with defendant's contention on its cross-appeal that the action with respect to the fire insurance policy was not commenced within 12 months after the inception of the loss, as specified in the statutory standard fire insurance contract provisions. *N. J. S. A.* 17:36–5.20, lines 157–161.

This suit has had a protracted and unusual procedural history. The original complaint was filed about five months

---

[4] Independent investigation discloses that the broad form of extended coverage, previously referred to as one of the coverages listed on the first page of the policy which could be obtained (at a slightly higher premium), which is the subject of F.I.R.O. – N. J. Form 220 – Edition January 1959 ("Dwelling Buildings and Contents"), specifically provides coverage for damage from bursting water pipes. Incidentally this form prominently sets forth on the front side a full list of all perils insured against in language and arrangement intelligible to the average person and with clear reference in each case to appropriate limitations or conditions thereof which are printed in a parallel column.

after the loss occurred. It asserted a cause of action only on the homeowner's policy, and made no mention of the fire insurance policy. The loss of February 1963 was referred to, but neither the nature of the damage, nor the property damaged was specified. The answer, beyond admitting the issuance of the policy, amounted to a general denial without any separate defenses. (It may have been that the loss to the building and household effects had not yet been settled). The pretrial order, entered almost two years later, made it clear that the suit was actually for water damage to the stored merchandise. Plaintiffs claimed that the loss thereto was covered by the homeowner's policy; defendant denied coverage. Plaintiffs further asserted that an agent of the defendant had given permission to store the damaged merchandise on the premises. But still no reference was made to the fire insurance policy.

Seven months later — long after the one year limitation period had expired — defendant was permitted to amend the pretrial order. Its present brief says that the amendment was made necessary "because of newly acquired knowledge". The amendment asserted the settlement under the homeowner's policy as an accord and satisfaction to any further claim thereon; set forth the existence of the fire insurance policy insuring the stored merchandise; and specified, as a further defense to any claim therefor under the homeowner's policy, that the latter contract contained a provision providing that it did not cover property specifically insured by any other insurance, *i. e.,* the fire insurance policy. This was the first indication that defendant was taking the position plaintiffs had sued under the wrong contract. The amendment order gave plaintiffs leave to amend their complaint to state a claim for relief under the fire policy.

Plaintiffs did so by adding a second count setting forth a claim of coverage under the fire insurance contract. Defendant answered that this contract did not cover the peril causing the damage and that, in any event, suit under it was not instituted within the 12 month period. By way of reply,

plaintiffs set up equitable estoppel based on representations of the agent as to coverage under the fire policy, which as noted has become the main issue in the case.

Thereafter plaintiffs moved to strike the limitation defense. The motion was granted and the Appellate Division affirmed, holding that the amendment of the complaint related back to the date of the original pleading within the fair meaning of *R. R.* 4:15–3, which reads:

"Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading; but the court, in addition to its power to allow amendments may, upon terms, permit the statement of a new or different claim or defense in the pleading."

 We think the Appellate Division was entirely correct.[5] The rule should be liberally construed. Its thrust is directed not toward technical pleading niceties, but rather to the underlying conduct, transaction or occurrence giving rise to some right of action or defense. When a period of limitation has expired, it is only a distinctly new or different claim or defense that is barred. Where the amendment constitutes the same matter more fully or differently laid, or the gist of the action or the basic subject of the controversy remains the same, it should be readily allowed and the doctrine of relation back applied. *Gudnestad v. Seaboard Coal Dock Co.,* 15 *N. J.* 210, 223 (1954); *Russo v. Wright Aeronautical Corp.,* 1 *N. J.* 417, 419 (1949). See also to the same effect 3 *Moore's Federal Practice,* § 15.15 [3] (*2nd ed.* 1968), considering the comparable federal rule. It should make no difference whether the original pleading sounded in tort, contract or equity, or whether the proposed

[5] We need not reach the question whether an action to recover from an insurer based on equitable estoppel arising from misrepresentation of the insurer's agent as to coverage at the inception of the contract is a suit "on the policy", within the limitation requirement.

amendment related to the original or a different basis of action.

Here the underlying event was a bursting water pipe which caused damage to property claimed to be insured by defendant. That occurrence is the basic subject of the controversy. A claim under another policy than that first sued upon is still the same matter differently laid. Moreover, from the standpoint of the rationale behind periods of limitation, defendant was not prejudiced here by the amendment since a claim had been made upon it from the outset for damage to the stored merchandise and it must be said to have been thoroughly familiar with the circumstances surrounding the loss and the provisions of its two policies. Further, as far as equities are concerned, defendant has no cause to complain about the amendment, since it concealed its position that plaintiffs were suing on the wrong contract until long after the 12 month period had run.

## II

We turn to the principal legal question in the case — whether, in an action at law on an insurance policy, equitable estoppel may operate to bring within its coverage risks or perils which are not provided for, or which are expressly excluded.

The courts of this state early held that estoppel was not available at law if the estopping conduct occurred before or at the inception of the contract. While the complete separation between law and equity, which remained in this state until 1948, undoubtedly contributed to this view, the main thesis of the cases was that an insurance policy was no different from any other integrated written contract between knowledgeable and sophisticated parties, and the parol evidence rule was thus held a bar to proofs which would vary the terms of the instrument. The leading cases, relied on by defendant here, are *Dewees v. Manhattan Insurance Co.*, 35 *N. J. L.* 366 (*Sup. Ct.* 1872), and *Franklin Fire Insur-*

*ance Co. v. Martin* 40 *N. J. L.* 568 (*E. & A.* 1878). In each there was a misdescription in the policy of the use to which the insured premises were put that was held to be a warranty; and in each the actual use was fully known to the insurer's agent at the time the policy was written, but that evidence was held inadmissible and recovery on the contract denied. The idea of estoppel *in pais* was cast aside as nothing more than a mere evasion of the parol evidence rule. Compare *Martin v. Jersey City Insurance Co.,* 44 *N. J. L.* 273, 276–277 (*Sup Ct.* 1882), where the court held that knowledge by the insurer's president, properly established by parol evidence, that, *after* the policy was issued, the insured made additions to the assured buildings, estopped the company from defending an action at law on the contract on the basis that there had been an increase of risk.

The holding of *Dewees* has persisted, despite the soundly established rule elsewhere that "any words or acts raising an equitable estoppel may be shown by parol testimony, and it is immaterial whether they occurred before or after the making of the formal contract." *Vance on Insurance* § 90 (c), *p.* 541 (*3rd ed.* 1951). See, *e. g., Vozne v. Springfield Fire and Marine Insurance Co.,* 115 *N. J. L.* 449 (*E. & A.* 1935), as well as the ruling of the trial court in the case at bar. *Vance* could thus in 1951 state in black-letter type that:

"Equitable estoppels as remedial incidents of actions at law on insurance policies have won tardy recognition. They are now recognized everywhere if the estopping conduct occurred after the inception of the contract; but the courts of Massachusetts and New Jersey and perhaps Nebraska, and the Federal courts, refuse to receive proof of estoppels arising before or at the inception of the contract on the assumption that the rule of policy known as the parol evidence rule would be thereby violated; * * *." (at *p.* 513).

New Jersey insureds have therefore been largely remitted to the rather strict remedy of reformation where the estopping conduct arose before or at the inception of the contract or perhaps, before 1948 as indicated in one case, to a collateral proceeding in chancery to enjoin the insurer from

setting up the claimed breach at law by reason of its inequitable conduct. See *Giammares v. Allemania Fire Insurance Co.,* 89 *N. J. Eq.* 460 (*Ch.* 1918), reversed on factual grounds 91 *N. J. Eq.* 114 (*E. & A.* 1919). But reformation, with its rigid requirements, including among other things that the proofs be clear, convincing and free from doubt, is frequently of no help, even though parol evidence is admissible in such cases. Again *Vance,* referring as examples to the opinion of the Court of Errors and Appeals in *Giammares,* and *Koch v. Commonwealth Ins. Co.,* 87 *N. J. Eq.* 90 (*Ch.* 1917), affirmed *o.b.* 88 *N. J. Eq.* 344 (*E. & A.* 1917), succinctly summarized the difficulty:

"The equitable remedy of reformation is not sufficiently broad to be available in securing the results arrived at under the rule of equitable estoppel. It frequently happens that evidence, that is sufficient to show clearly such inequitable conduct on the part of the insurer as to estop him from setting up a breach of condition, falls short of that certainty that is required to prove the terms of a contract which a court of equity is asked to substitute, by reformation, in place of the one actually executed. * * * It is not at all impossible that the insurer intended to make the contract exactly as written, though knowing that as so written it imposed no enforceable duty upon him and that he was taking the insured's premium money without rendering any consideraion therefor. Upon proof of such a state of facts, there is no intended agreement which the court can substitute for that executed. But there is an estoppel which will preclude the insurer from profiting by his fraud. * * *" (at *p.* 471, *n.* 3).

Professor Clarence Morris penetratingly analyzed the reason for the development of equitable estoppel, as well as waiver, in the insurance field in his article, *Waiver and Estoppel in Insurance Policy Litigation,* 105 *U. Pa. L. Rev.* 925 (1957):

"Indexes to the great nineteenth century insurance texts do not list waiver and estoppel. But times have changed. The 1951 third edition of *Vance on Insurance* enfolds an excellent and important seventy-six page 'Waiver & Estoppel' chapter — about a fourteenth of the book's bulk. What has fostered this growth in the last hundred years? My thesis is that waiver and estoppel are two of several guises that cloak the courts' part in changing insurance from a service

safely bought only by sophisticated businessmen to a commodity bought with confidence by untrained consumers. Judges, at the urging of policyholders' advocates, have used waiver and estoppel to convert insurance from a custom-made document designed in part by knowing buyers to a brand-name staple sold over the counter by mine-run salesmen to the trusting public.

"Seventéenth and eighteenth century marine insurance contracts were handwritten; hull and cargo owners and their brokers knew insurance as thoroughly as the underwriters. When a marine policy buyer entertained a proposal of a warranty, he bargained for important premium concessions and knew the courts would construe the warranty strictly against him. American draftsmen-lawyers, sometimes in the hire of fly-by-night companies, proliferated fine print in the nineteenth century fire and life insurance policies. Companies, spurred by competition, debased their product (as the Germans did their linen). Restrictions on coverage, not noticed or not understood by policyholders at the time of issue, became painfully clear after uncovered losses which policyholders would have paid to cover. The insurance market might have soured had not the law stepped in and afforded consumer protection greater than companies intended to sell.

"Of course this process of favoring consumers can be carried too far. Insurance companies need and are entitled to reasonable limits on their responsibilities; the public is prejudiced when company liabilities are by generous caprice stretched over risks that cannot be profitably underwritten at a just premium. By and large, however, the courts have not been overgenerous to the public. Judges have limited their use of the doctrines of waiver and estoppel because of their awareness of important underwriting realities." (at *pp.* 925–926).

It is clear that this court's approach to defenses to claims on insurance contracts has changed very substantially in recent years. Our expressions have come in a variety of issues and contexts, but all have indicated as their keystone the goal of greater protection to the ordinary policyholder untutored in the intricacies of insurance. We have realistically faced up to the fact that insurance policies are complex contracts of adhesion, prepared by the insurer, not subject to negotiation, in the case of the average person, as to terms and provisions and quite unintelligible to the insured even were he to attempt to read and understand their unfamiliar and technical language and awkward and unclear arrangement. Recognition is given to the usual and justi-

fiable reliance by the purchaser on the agent, because of his special knowledge, to obtain the protection he desires and needs, and on the agent's representations, whether that agent be a so-called "independent" but authorized representative of the insurer, or only an employee. We have stressed, among other things, the aim that average purchasers of insurance are entitled to the broad measure of protection necessary to fulfill their reasonable expectations; that it is the insurer's burden to obtain, through its representatives, all information pertinent to the risk and the desired coverage before the contract is issued; and that it is likewise its obligation to make policy provisions, especially those relating to coverage, exclusions and vital conditions, plain, clear and prominent to the layman. It is only necessary to list the leading cases. *Kievit v. Loyal Protective Life Insurance Company,* 34 *N. J.* 475 (1961); *Bauman v. Royal Indemnity Co.,* 36 *N. J.* 12 (1961); *Merchants Indemnity Corp. v. Eggleston,* 37 *N. J.* 114 (1962); *Allen v. Metropolitan Life Insurance Co.,* 44 *N. J.* 294 (1965); *Gerhardt v. Continental Insurannce Cos.,* 48 *N. J.* 291 (1966); *Cooper v. Government Employees Insurance Co.,* 51 *N. J.* 86 (1968); *Bowler v. Fidelity & Casualty Co. of N. Y.,* 53 *N. J.* 313 (1969); *Lischin v. Nationwide Mutual Insurance Co.,* 54 *N. J.* 132 (1969), reversing on dissenting opinion 104 *N. J. Super.* 525, 527 (*App. Div.* 1969). See also *Portella v. Sonnenberg,* 74 *N. J. Super.* 354 (*App. Div.* 1962); *Muller Fuel Oil Co. v. Insurance Co. of North America,* 95 *N. J. Super.* 564 (*App. Div.* 1967).

■ Although we have not previously passed upon the question here involved, we have no hesitation in deciding, in line with the rationale just outlined, that, speaking broadly, equitable estoppel is available to bar a defense in an action on a policy even where the estopping conduct arose before or at the inception of the contract, and that the parol evidence rule does not apply in such situations. The contrary holding of *Dewees v. Manhattan Insurance Co.,*

*supra* (35 *N. J. L.* 366) and *Franklin Fire Insurance Co. v. Martin, supra* (40 *N. J. L.* 568) and their progeny can no longer be considered to be the law of this state.

However, many jurisdictions which have long followed this view nevertheless hold that equitable estoppel is not available to broaden the *coverage* of a policy so as to protect the insured against risks not included therein or expressly excluded therefrom, as distinct from alleviation of other limitations or conditions of the contract. The contrary approach is suggested in passing in *Merchants Indemnity Corp. v. Eggleston, supra* (37 *N. J.,* at 129), and two Appellate Division decisions definitely lean that way, *Portella v. Sonnenberg, supra* (74 *N. J. Super.* 354) (a reformation case), and *Muller Fuel Oil Co. v. Insurance Co. of North America, supra* (95 *N. J. Super.* 564) (a declaratory judgment action). And, of course, the Appellate Division specifically so held in this case. 99 *N. J. Super.,* at 94–95. On the other hand, at least two opinions of lower tribunals expressly state that estoppel is unavailable to broaden coverage. *Goldberg v. Commercial Union Insurance Co. of N. Y.,* 78 *N. J. Super.* 183, 191–192 (*App. Div.* 1963); *Cox v. Santoro,* 94 *N. J. Super.* 319, 324 (*Law Div.* 1967), affirmed 98 *N. J. Super.* 360 (*App Div.* 1967).

The cases outside New Jersey are collected and discussed in an extensive annotation, *Doctrine of estoppel or waiver as available to bring within coverage of insurance policy risks not covered by its terms or expressly excluded therefrom,* 1 *A. L. R.* 3*d* 1139 (1965). While there is a clear split of authority, with the decisions holding estoppel not available to broaden coverage presently representing the majority view, many of the cases so stating are confusing and not clear cut. Estoppel and waiver are often interchangeably and improperly used, and in many cases where estoppel is held unavailable the necessary elements have not been made out anyway, or the insured by reason of his own conduct is clearly not entitled to relief. The reasons generally

advanced in support of the majority view are that a court cannot create a new contract for the parties, that an insurer should not be required by estoppel to pay a loss for which it charged no premium, and perhaps that a risk or peril should not be imposed upon an insurer which it might have declined.

We are more impressed with the decisions in those jurisdictions which hold that equitable estoppel is utilizable to bar a defense of non-coverage of the loss claimed, *i. e.,* the minority rule. The following cases, arising in various contexts, are illustrative: *Golden Gate Motor Transport Co. v. Great American Indemnity Co.,* 6 *Cal. 2d* 439, 58 *P. 2d* 374 (1936); *Ivey v. United National Indemnity Company,* 259 *F. 2d* 205 (*9th Cir.* 1958) (applying California law); *American Surety Co. of New York v. Heise,* 136 *Cal. App. 2d* 689, 289 *P. 2d* 103 (*Dist. Ct. App.* 1955); *Beach v. United States Fidelity & Guaranty Co.,* 205 *Cal. App. 2d* 409, 23 *Cal Rptr.* 73 (*Dist. Ct. App.* 1962); *Modica v. Hartford Accident and Indemnity Company,* 236 *Cal App. 2d* 588, 46 *Cal. Rptr.* 158 (*Dist. Ct. App.* 1965); *Mutual Benefit Life Insurance Co. v. Bailey,* 55 *Del.* (5 *Storey*) 215, 190 *A. 2d* 757 (1963); *United Pacific Insurance Co. v. Meyer,* 305 *F. 2d* 107 (*9th Cir.* 1962) (applying Idaho law); *Preferred Risk Mutual Insurance Co. v. Thomas,* 372 *F. 2d* 227 (*4th Cir.* 1967) (applying South Carolina law); *Farmers Mutual Automobile Insurance Co. v. Bechard,* 80 *S. D.* 237, 122 *N. W. 2d* 86, 1 *A. L. R. 3d* 1124 (1963); *State Automobile Casualty Underwriters v. Ruotsalainen,* 81 *S. D.* 472, 136 *N. W. 2d* 884 (1965); *Dodge v. Aetna Casualty & Surety Co., Vt.,* 250 *A. 2d* 742 (1969).

These decisions all proceed on the thesis that where an insurer or its agent misrepresents, even though innocently, the coverage of an insurance contract, or the exclusions therefrom, to an insured before or at the inception of the contract, and the insured reasonably relies thereupon to his ultimate detriment, the insurer is estopped to deny cover-

age after a loss on a risk or from a peril actually not covered by the terms of the policy. The proposition is one of elementary and simple justice. By justifiably relying on the insurer's superior knowledge, the insured has been prevented from procuring the desired coverage elsewhere. To reject this approach because a new contract is thereby made for the parties would be an unfortunate triumph of form over substance. The fact that the insurer has received no premium for the risk or peril as to which the loss ensued is no obstacle. Any additional premium due can be deducted from the amount of the loss. See *Merchants Indemnity Corp. v. Eggleston, supra* (37 *N. J.,* at 130); *Golden Gate Motor Transport Co. v. Great American Indemnity Co., supra* (58 *P. 2d,* at 379); *Modica v. Hartford Accident and Indemnity Co., supra* (46 *Cal. Rptr.,* at 163). If the insurer is saddled with coverage it may not have intended or desired, it is of its own making, because of its responsibility for the acts and representations of its employees and agents. It alone has the capacity to guard against such a result by the proper selection, training and supervision of its representatives.[6] Of course, the burden of proof of equitable estoppel rests on the insured and, since evidence of representations is almost always oral, a trial court must be convinced that the requisite elements have been established by reliable proof and that the insured has met his burden by a fair preponderance of the evidence.

We agree with the Appellate Division that New Jersey should adopt the view that equitable estoppel is available, under appropriate circumstances, to bring within insurance coverage risks or perils which are not provided for in the policy or which are expressly excluded.

---

[6] In any event, the defendant here has not contended that water damage from bursting pipes in a dwelling is a peril which it would not insure against. It is expressly included in the homeowner's policy covering household goods and effects and, as we have indicated, is also included in the provisions of the broad form of fire policy extended coverage. See footnote (4), *supra.*

## III

In the light of what has just been said, we shall now consider the precise issue before us: Whether plaintiffs made out a sufficient case of equitable estoppel to withstand the motion for involuntary dismissal and to require defendant to go forward with its proofs. Here we part company with the Appellate Division; we think that an adequate showing was made, and that tribunal was mistaken in reaching the contrary conclusion. This is not to intimate, of course, that plaintiffs must win on the retrial. Defendant's proofs may be so substantial when all the evidence is in that plaintiffs will not be entitled to a judgment. (Defendant's counsel, when questioned at oral argument, responded that he did not know what the agent's testimony would be.)

As to the element of misrepresentation, we have fully set forth earlier in this opinion plaintiffs' proofs and the legitimate inferences to be drawn therefrom. We need now only summarize. Mr. Harr asked Mr. Meinsohn to "cover" the business merchandise stored in the basement of his house. Mr. Meinsohn advised Mr. Harr that he was "fully covered". Since Meinsohn knew that the homeowner's policy he had written included coverage for the common peril of water damage from bursting pipes in the same building, it may be inferred that he should have realized that Harr, when he used the word "cover", had in mind and would reasonably expect the same coverage in the policy to be written on the merchandise and that, in the absence of an express statement to the contrary, Meinsohn's use of the phrase "fully covered" would be understood by Harr to encompass that peril, and that Harr could and would reasonably rely thereon. This would be true even if Meinsohn were innocently mistaken and believed at the time that the fire policy to be issued would insure against this peril. Therefore there was enough to make out *prima facie* the element of misrepresentation. Indeed the situation is quite analogous to that in *Bauman v. Royal Indemnity Co., supra* (36 *N. J.*

12), where this court held that an insured was entitled to assume, absent express advice to the contrary, that a renewal policy provided the same coverage as the original contract.

With respect to the element of reliance, it will be recalled that the policy was not issued until 15 days after Mr. Meinsohn told Mr. Harr he was "fully covered" and, by reason of his absence in Florida known to Meinsohn, was not actually received until some undisclosed date thereafter. Mr. Harr expressly testified that he had confidence in Meinsohn and relied on his representation of full coverage, which certainly demonstrates sufficient reliance at least until the written contract reached him and he had a reasonable opportunity to examine it. He very candidly said that he read it while vacationing in Florida, but the time was not placed with reference to the date of loss, nor was he asked whether he understood that it did not provide coverage for water damage from bursting pipes. Assuming that he read it before the loss and that he did appreciate the lack of coverage, we do not know whether there would have been sufficient time under the circumstances to communicate with defendant to have the coverage added, or to procure adequate insurance elsewhere. *Cf. Volker v. Connecticut Fire Insurance Co., 22 N. J. Super.* 314 *(App. Div.* 1952). If he thoroughly understood the policy provisions, and if there was sufficient time to act, but he did nothing, reliance could not be found.

We have already pointed out that the fire policy would be confusing to the average person as to coverage, especially with respect to water damage, and in the absence of any admission of thorough understanding from the reading, we think the inference should be drawn, for the purposes of a dismissal action at the end of plaintiffs' case, that Mr. Harr, as a layman, did not so appreciate. While we have said that, in general, an insured is chargeable, for reasons of business utility, with knowledge of the contents of a policy in the absence of fraud or inequitable conduct on the part of the insurer, *Merchants Indemnity Corp. v. Eggleston, supra* (37 *N. J.,* at 121–122), where such fraud or inequitable

conduct does appear, as here in the light of Harr's testimony with respect to the agent's representations as to coverage, the insured is bound only to make such examination as would be reasonable for the average person under the particular circumstances, and he will only be held to that to which he would be thereby alerted. *Portella v. Sonnenberg, supra* (74 *N. J. Super.*, at 360–362). Indeed, even absent such representations by the agent, where the language of the policy is such that the layman would not understand its full import were he to attempt to plow through it, such provisions will be deemed to give the maximum protection consistent with its language and the reasonable expectation of the insured, as the Appellate Division pointed out below (99 *N. J. Super.*, at 95). *Gerhardt v. Continental Insurance Cos., supra* (48 *N. J.*, at 298–300). And we have also held that where the insured was entitled to and did rely upon the representations of an agent as to coverage, the insured can assume that the policy conforms to the representations and he is not barred from an action against the agent for negligence (or presumably against the agent's principal, the insurer) because he failed to read it at all. *Rider v. Lynch,* 42 *N. J.* 465, 482 (1964).

Therefore, under the proofs and inferences as they exist at this posture of the case, we conclude plaintiffs made a sufficient showing of reliance to defeat the dismissal motion. That such reliance was to their detriment is obvious. All the elements of equitable estoppel were consequently *prima facie* established.

The judgment of the Appellate Division which is the subject of the cross-appeal is affirmed; its judgment on the main appeal is reversed and the case is remanded to the Law Division for a new trial.

*For reversal of main appeal*—Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—6.

*For affirmance of main appeal* — None.

*For affirmance of cross-appeal*—Justices JACOBS, FRANCIS, PROCTOR, HALL SCHETTINO and HANEMAN—6.

*For reversal of cross-appeal*—None.