759 A.2d 1230

VUARNET FOOTWEAR, INC., PLAINTIFF–RESPONDENT/CROSS–
APPELLANT, v. SEA–RAIL SERVICES CORP., DEFENDANT,
AND ROYAL INSURANCE COMPANY OF AMERICA, DEFEN-
DANT–APPELLANT/CROSS–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued September 26, 2000—Decided October 16, 2000.

Before Judges PRESSLER, KESTIN and CIANCIA.

*Nooshin Namazi* argued the cause for appellant/cross-respondent Royal Insurance Company of America (*Nicoletti Hornig & Sweeney*, attorneys; *Ms. Namazi*, on the brief).

*David Scott Lafferty* argued the cause for respondent/cross-appellant (*Kim & Lafferty*, attorneys; *Mr. Lafferty*, on the brief).

The opinion of the court was delivered by

PRESSLER, P.J.A.D.

Plaintiff Vuarnet Footwear, Inc., an importer and wholesaler of sneakers, brought this action against defendant Royal Insurance Company of America, seeking to recover the value of a container of merchandise shipped to it from Indonesia and lost in transit during the final leg of its journey—from the bonded warehouse in Secaucus to plaintiff's South Hackensack warehouse. The container was apparently stolen while it was in the hands of the trucker, defendant Sea–Rail Services Corp.[1] The trial court granted plaintiff's motion for summary judgment, ruling that as a matter of undisputed fact the goods were covered at the time of the theft under the marine cargo policy issued by Royal to Vuarnet. Royal appeals, and we affirm, but for different reasons than those relied on by the trial judge.

It is undisputed that the stolen container was shipped from Indonesia, together with a second container that arrived in South Hackensack safely, aboard a vessel of the Hanjin Shipping Company, arriving at the Port of Seattle on August 28, 1996. Hanjin had arranged for the transshipment of the containers from Seattle by rail to the container yard of Resources Warehousing & Consolidated Services in Secaucus, New Jersey, part of the Port of New York. Since the Port of New York had been designated in the shipping papers as the port of final destination,[2] that is where the

---

[1] Plaintiff has represented to us that Sea–Rail is insolvent and the action consequently did not proceed against it.

[2] As we understand the transaction as explained by the representative of the international freight forwarder, the final destination was actually designated as the Port of New York, of which the rail terminus of transshipments is a part.

goods were to clear customs. The containers arrived there on September 5, 1996, and were available for release to plaintiff when the freight charges were paid and its customs house broker secured customs clearance. Plaintiff instructed its custom house broker to clear the shipment on September 20, and it did so on that day. It was not, however, until October 7, 1996, that Sea–Rail picked up the containers to truck them from Secaucus to South Hackensack, plaintiff asserting, however, that it had instructed Sea–Rail to do so on October 3, 1996. The customs house broker, who actually made the arrangement for transit from Secaucus to South Hackensack, had asserted in his deposition that his instruction from plaintiff was to have Sea–Rail pick up the containers on successive days, the first on October 4, 1996. Since, however, October 4 was a Friday, successive days meant that the second container would have been picked up on October 7, the following Monday. In any event, it appears that Sea–Rail picked up both containers on Monday, October 7, and since it apparently regarded it as then too late in the day to make the delivery the short distance from Secaucus to South Hackensack, it transported the two containers to its premises in Union, New Jersey, for later delivery. One of the containers was stolen from those premises. The exact date of the theft was not established, but it was, in any case, no later than Wednesday, October 9. Plaintiff and its agents were promptly notified and this claim against defendant promptly made. Defendant disclaimed.

Determination of coverage under the foregoing circumstances requires analysis and construction of the marine cargo insurance policy issued by defendant. The policy has three coverage sections. Section I is captioned "Ocean Cargo," Section II is captioned "Domestic Transportation," and Section III is captioned "Warehouse Storage." Paragraph 21 of Section I, the warehouse-to-warehouse clause, which we believe is the applicable coverage provision, provides in full as follows:

> This insurance attaches from the time the goods leave the warehouse and/or store at the place named in the policy for the commencement of the transit and continues during the ordinary course of transit, including customary transshipment, if any,

until the goods are discharged overside from the overseas vessel at the final port. Thereafter the insurance continues whilst the goods are in transit and/or awaiting transit until delivered to the final warehouse at the destination named in the Policy or until the expiry of (15) days (or 30 days if the destination to which the goods are insured is outside the limits of the port) whichever shall first occur. The time limits referred to above are to be reckoned from midnight of the day on which the discharge overside of the goods hereby insured from the overseas vessel is completed. Held covered at a premium to be arranged in the event of transshipment, if any, other than as above and/or in the event of delay in excess of the time limits arising from circumstances beyond the control of the Assured.

Despite the abstruseness and archaicisms of the text of this paragraph, this much at least can be extracted—subject to the various provisos and conditions, the goods are covered from the point in time at which they leave the warehouse at the place of origin of the shipment until they reach the warehouse at the final destination named in the policy, i.e., in this case, from the time they left the warehouse in Indonesia until arrival at plaintiff's warehouse in South Hackensack. Now for the conditions. Apparently there are no vitiating conditions, in this paragraph at least, until "the goods are discharged overside from the overseas vessel at the final port." We understand, and the parties evidently agree, that when transshipment is by land, the quoted clause includes not only the actual vessel but also the land transport of the goods to the "final port." And "final port" in that context means the place so designated in the shipping documents, including not only docks at which ships unload but the facilities within the port area to which the land carrier brings the goods for customs house clearance, that place constituting the end of the overseas journey. In this case, then, the transshipment was completed and the goods discharged at the final port when the rail carrier delivered them to the yard of Resources Warehousing, the bonded warehouse from which they would clear customs. That happened on September 5, 1996. The undisputed evidence, by way of deposition testimony, however, was that goods are ordinarily not releasable from the bonded warehouse, that is, that the customs broker's clearance process cannot begin for a day or two after discharge at the bonded warehouse yard.

The coverage under the warehouse-to-warehouse clause does not, however, end when the goods are discharged at the final port. The clause expressly provides that thereafter "the insurance continues whilst the goods are in transit and/or awaiting transit until delivered to the final warehouse at the destination named in the Policy...," here, South Hackensack. The condition of this coverage, however, is that its continuation lasts only until the first occurring of either arrival of the goods at the final warehouse or until the expiration of thirty days from the discharge of the goods at the final port. Finally, the provision permits an extension of that time period at an additional premium if there is a delay in the arrival of the goods at the final warehouse beyond the thirty-day time limit for reasons beyond the control of the insured. This is the so-called held-covered clause.

As we understand defendant's position, it disclaims coverage for two reasons. First, it argues that since the goods were discharged in Secaucus on September 5, coverage lapsed under the terms of the warehouse-to-warehouse clause thirty days later, namely, at midnight on October 5, and hence the goods were no longer covered on October 7, the first day on which the loss could have occurred. It further contends that there were no reasons for the delay beyond the insured's control that would have permitted it to extend the coverage after expiration of that period subject to an additional premium. More significantly, however, it argues that contrary to the express language of the warehouse-to-warehouse clause, that clause does not provide an absolute window of thirty days from the date of discharge at the final port and while in transit or awaiting transit. Rather, it claims, the warehouse-to-warehouse clause is subject to Clause G of the marine extension clauses, spelled out in Paragraph 22A. That clause makes it a condition "of this insurance that there shall be no interruption or suspension of transit unless due to circumstances beyond the control of the Assured." In effect, defendant urges that if that marine extension clause has been violated, then the coverage condition of the warehouse-to-warehouse clause requiring that the goods be "in the ordinary course of transit" has also necessarily

been breached. The argument assumes, as well, that the "ordinary course of transit" condition, specified only with respect to the shipment up until the final port, also applies to the transit from the final port to the final warehouse destination even though the text of the clause does not so provide. Defendant's contention is that plaintiff interrupted or suspended transit by its delay in retrieving the container from the bonded warehouse and also thereby breached the condition of "ordinary course of transit."

On motion and cross-motion for summary judgment, the trial judge entered summary judgment for plaintiff not, however, on Section I of the policy but rather Section II relating to domestic transportation. The judge accepted defendant's contention that Section I coverage had lapsed by reason of the occurrence of the loss more than thirty days from the date of discharge of the goods at the final port, but he reasoned that Section II was nevertheless applicable since the loss occurred after the goods had been discharged and while in the hands of a carrier for domestic transportation purposes only. Defendant argued, assuming the applicability of Section II at all, that plaintiff had forfeited that coverage by its breach of Paragraph 9B of Section II, the reporting and payment of premiums clause, which makes it a condition of the coverage that

> B. The Assured agrees to report to the Company the total value, calculated in accordance with Valuation clause contained herein, of shipments made during the reporting periods as shown below, and to pay premium thereon at the rate(s) shown below.
>
> Rate per $100: $0.06
>
> Reports to be made: Monthly

The trial judge rejected this argument on the ground that plaintiff's notice of loss constituted adequate reporting and that defendant was not prejudiced by the delay in reporting since it would in any event be entitled to a credit for the premium that should have been paid prior to the loss but was not. It was on that basis that the court entered summary judgment in favor of plaintiff. We agree that plaintiff was entitled to summary judgment, but under

the warehouse-to-warehouse clause of Section I and not under Section II.[3]

The subject of marine cargo insurance has not apparently been addressed in a reported decision in this State although a substantial body of law respecting its various provisions has developed throughout the state and federal courts, which are by no means unanimous in their interpretations. *See generally* Donald T. Rave, Jr., & Stacey Tranchina, *Marine Cargo Insurance: An Overview*, 66 *Tul. L.Rev.* 20 (1991). We are satisfied that while the subject of marine cargo insurance may not be a familiar one in this jurisdiction, there is no reason to except construction of its coverage provisions from our well-settled general principles of interpretation of contracts of insurance.

 In short, it is a fundamental premise in this jurisdiction that insurance policies, as contracts of adhesion, are required to be construed in order to meet the insured's reasonable expectations. Hence ambiguous provisions are to be construed liberally in favor of the insured, and exclusions from and exceptions to coverage are to be strictly construed against the insurer. *See, e.g., Gibson v. Callaghan*, 158 *N.J.* 662, 671, 730 *A.2d* 1278 (1999); *United Serv. Auto. Ass'n v. Turck*, 156 *N.J.* 480, 492–493, 721 *A.2d* 1 (1998); *American Motorists Ins. Co. v. L–C–A Sales Co.*, 155 *N.J.* 29, 41, 713 *A.2d* 1007 (1998). Thus, as Justice Hall explained over thirty years ago in *Harr v. Allstate Insurance Co.*, 54 *N.J.* 287, 303–304, 255 *A.2d* 208 (1969):

> It is clear that this court's approach to defenses to claims on insurance contracts has changed very substantially in recent years. Our expressions have come in a variety of issues and contexts, but all have indicated as their keystone the goal of greater protection to the ordinary policyholder untutored in the intricacies of insurance. We have realistically faced up to the fact that insurance policies are complex contracts of adhesion, prepared by the insurer, not subject to negotiation,

---

[3] Plaintiff has cross-appealed from the determination that it had no coverage under Section I. We doubt that an appeal lies from that determination since appeals may be taken only from decretal provisions of judgments and orders, not from the reasons therefor. *See, e.g., Luppino v. Mizrahi*, 326 *N.J.Super.* 182, 185, 740 *A.2d* 1111 (App.Div.1999). In any event, the cross appeal is now moot.

in the case of the average person, as to terms and provisions and quite unintelligible to the insured even were he to attempt to read and understand their unfamiliar and technical language and awkward and unclear arrangement. Recognition is given to the usual and justifiable reliance by the purchaser on the agent, because of his special knowledge, to obtain the protection he desires and needs, and on the agent's representations, whether that agent be a so-called "independent" but authorized representative of the insurer, or only an employee. We have stressed, among other things, the aim that average purchasers of insurance are entitled to the broad measure of protection necessary to fulfill their reasonable expectations; that it is the insurer's burden to obtain, through its representatives, all information pertinent to the risk and the desired coverage before the contract is issued; and that it is likewise its obligation to make policy provisions, especially those relating to coverage, exclusions and vital conditions, plain, clear and prominent to the layman.

■ We first address, in the light of these principles, defendant's claim that the apparent thirty-day window of the warehouse-to-warehouse clause is subject to the "interruption of transit" provision of the marine extension clause and that such a vitiating interruption occurred here as the result of plaintiff's delay in completing the final, post-customs clearance stage of the transport by leaving the goods at the bonded warehouse for some four weeks. In short, it asserts that because of plaintiff's subjective intent to use the bonded facility for warehousing [4] because it may not have had room for the goods at that time in its own warehouse, it had effectively interrupted transit and would not have been entitled to coverage even if the goods had in fact been removed from the bonded warehouse and had been thereafter stolen from the trucker within the thirty-day period.

■ We reject that contention as being contrary to the express language and fair meaning of the warehouse-to-warehouse clause, which unambiguously provides coverage while the goods are not only in transit but are also awaiting transit and addresses delay in completing transit beyond thirty days by way of the held-covered clause. We have, of course, no doubt that if an insured has taken affirmative and objectively determinable steps at any

---

[4] The deposition testimony asserts, without dispute, that customarily the bonded warehouse does not start to charge storage for the goods until ten days, exclusive of non-business days, after their offloading there.

time during the thirty-day period to terminate the transit or to deviate materially from the normal course of transit or awaiting transit, coverage may be well forfeited. *See generally Ore & Chemical Corp. v. Eagle Star Ins. Co.,* 489 *F.*2d 455, 456–57 (2d Cir.1973). But we are also persuaded that a delay that is subject to the held-covered provision of the warehouse-to-warehouse clause cannot at the same time be deemed to constitute · an interruption of transit within the intendment of the marine extension clause since the applicability of the marine extension clause in those circumstances would nullify the coverage and the conditions thereof plainly afforded by the warehouse-to-warehouse clause. Nor do we believe an insured would equate an interruption in transit with a delay in transit, and we decline to do so. In our view, a delay in transit is equatable with awaiting transit, and goods awaiting transit within the thirty-day period are covered. In short, the warehouse-to-warehouse clause is, in our view, reasonably construable as covering goods still in the bonded warehouse and awaiting transit therefrom provided the insured has taken no affirmative steps contradicting the eventual completion of the transit from the bonded warehouse to the warehouse of final destination within the thirty-day period. That is to say, we are satisfied that an insured would be likely to read the policy as covering the goods under these circumstances, that such a reading is fair in view of the apparent ambiguities created by juxtaposing the marine extension clause against the warehouse-to-warehouse clause, that reading the policy in this manner fulfills the insured's reasonable expectations, and that denying coverage in these circumstances would defeat those expectations.

For these reasons, we conclude that the goods were covered for thirty days after reaching the bonded warehouse in Secaucus, and thus had the theft occurred prior to midnight on Saturday, October 5, 1996, the thirtieth day after offloading, defendant would have been clearly obliged to pay for the loss under the terms of the policy. The problem, of course, is that the theft did not occur until, at the earliest, the thirty-second day. We regard the

intervening weekend of October 5 and October 6, 1996 as, however, of signal significance.

First, as we have pointed out, the instruction to Sea–Rail was, according to plaintiff, to pick up the container from Secaucus on Thursday, October 3, or, according to the customs house broker, to pick up the two containers on successive days, the first on Friday, October 4. Had October 4 not been a Friday, and had Sea–Rail performed according to instructions, both containers would have been delivered within the thirty-day period. We are also satisfied that had the insured known that Sea–Rail would not make the Friday, October 4, pickup and would not make a pickup on Saturday, October 5, it could have resorted to the held-covered clause to assure the continuation of insurance for another two days. But there is nothing in the warehouse-to-warehouse clause generally or in the held-covered provision that specifically requires the insurer to be notified and the extra premium arranged within the thirty-day window. Where questions of notice to the insurer are in issue, this jurisdiction adheres to the rule that coverage will not be defeated by an untimely notice unless, by reason thereof the insurer has been prejudiced. *See, e.g., Harrow Stores, Inc. v. Hanover Ins. Co.,* 315 *N.J.Super.* 547, 550, 719 *A.2d* 196 (App.Div. 1998); *Polarome Mfg. Co. v. CIIC,* 310 *N.J.Super.* 168, 175, 708 *A.2d* 450 (App.Div.), *certif. denied,* 155 *N.J.* 590, 715 *A.2d* 993 (1998). Defendant alleges no prejudice and we perceive none beyond its right to the additional premium for which it is entitled to a credit. That is to say, the shipment was lost while in actual transit and while in the hands of a carrier, precisely the risk insured against. That the loss occurred within two or so days after the expiration of the thirty-day window is, in our view, not material, because continued coverage was still available under the held-covered clause.

Plaintiff also argues that a proper counting of the thirty-day window should exclude weekends, contending that when the last day of an insured period falls on a non-business day, the coverage is extended to the next following business day. The

assertion is that since the thirtieth day was a Saturday, coverage continued until midnight of the first business day thereafter, *i.e.,* the Monday on which the loss did in fact presumptively occur.[5] There is some support in this jurisdiction for the proposition that when the last day of a time period specified by a policy of insurance falls on a non-business day, the period is extended until the next business day. *See, e.g., Bohles v. Prudential Insurance Co.,* 84 *N.J.L.* 315, 316, 86 *A.* 438 (E. & A.1912) (so holding in respect of the grace period in a life insurance policy). *And see Guardian Life Insurance Company v. Goduti–Moore, et als.,* 229 *F.*3d 212 (3d Cir.2000), construing both New Jersey law and New York law, which it concluded were the same on the subject, and holding that where a contractual time period within which an act must be performed falls on a Saturday or Sunday, the time is extended by operation of law until the next business day. *See also N.J.S.A.* 36:1–1, 1.1 (deeming various deadlines postponed until the next business day); *Mercer County Park Comm. v. DiTullio,* 139 *N.J.Super.* 36, 352 *A.*2d 264 (App.Div.), *certif. denied,* 70 *N.J.* 276, 359 *A.*2d 488 (1976) (Saturdays and Sundays are not counted in calculating the expiration of the thirty-day period for accepting public bids); *McConnell v. Beach Realty Co.,* 128 *N.J.L.* 493, 27 *A.*2d 195 (Sup.Ct.1942), *aff'd,* 131 *N.J.L.* 325, 36 *A.*2d 604 (E. & A.1944) (a tenant does not hold over by virtue of his removal one day after the expiration of a lease which falls on Sunday). *But cf. Flowers by DiAlton's v. American Ins. Co.,* 39 *N.J.Super.* 44, 120 *A.*2d 501 (Law Div.), *aff'd,* 42 *N.J.Super.* 493, 127 *A.*2d 175

---

[5] As we have pointed out, the exact date of the theft cannot be ascertained. If coverage depends on whether it occurred on Monday, October 7, or the next day or the day after, we simply point out that the burden of proving that the loss was outside the apparent coverage falls upon the insurer, *see Diamond Shamrock Chem. Co. v. Aetna Cas. & Surety Co.,* 258 *N.J.Super.* 167, 216, 609 *A.*2d 440 (App.Div.1992), *certif. denied,* 134 *N.J.* 481, 634 *A.*2d 528 (1993), and defendant concedes its inability to prove that the theft did not take place on October 7, the day the goods came into Sea–Rail's hands and were first stored overnight in its yard.

(App.Div.1956) (statutory ten-day temporary insurance binder is not extended if the period terminated on Sunday).

█ Plaintiff's argument thus is that the next-business-day principle extended its thirty-day period for completing the transit to Monday, the thirty-second day, particularly as it appears that its truck carrier, Sea–Rail, either did not have access to the bonded warehouse on weekends or did not itself initiate transport on those days, a proposition that defendant did not seek to disprove. Consequently, the goods were still insured if stolen, as is presumed, before midnight on the Monday following the calendar thirtieth day. We further point out that even if the policy were construed as requiring notice to the insurer under the held-covered clause by the thirtieth day, the next business-day rule would also have extended that time until the Monday, the presumed day of the loss.

Based on the foregoing, we conclude that under the warehouse-to-warehouse clause of Section I of this policy, plaintiff was entitled to a recovery from defendant and that its motion for summary judgment was, therefore, properly granted.

As we have pointed out, it is our view that Section I of the policy and not Section II, relative only to domestic transport, is here involved. We note, however, that if defendant were correct in its assertion that Section I coverage was forfeited by reason of an interrupted transit, then it would appear clear that the domestic transportation coverage of Section II might well apply from the time Sea–Rail removed the goods from the bonded warehouse. Moreover, if Section II were to apply, we would agree with the trial judge that because the insurer suffered no prejudice from late notice of value of the goods and late determination of the premium, plaintiff would be entitled to a recovery under that Section subject to defendant's right to a credit for the unpaid premium. Accordingly, if Section II were to have applied, we would affirm for the reasons stated by the trial judge.

The summary judgment appealed from is affirmed.