**Alda Lee SOUZA, Appellant,**

v.

**William A. CORVICK et al.**

**No. 22930.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 10, 1970.

Decided Dec. 10, 1970.

---

Mr. Courtney B. Justice, Logansport, Ind., for appellant.

Mr. Jerome S. Berg, Washington, D. C., with whom Edward C. O'Connell, Washington, D. C., was on the brief, for appellee Travelers Indemnity Company.

Messrs. Hubert B. Pair, Acting Corporation Counsel for the District of Columbia at the time the brief was filed, and Richard W. Barton, Asst. Corporation Counsel, were on the brief, for appellee District of Columbia. Messrs. Lewis D. Clarke and Ted D. Kuemmer-

ling, Asst. Corporation Counsel, also entered appearances for appellee District of Columbia.

Mr. John F. Cooney, Washington, D. C., was on the brief for appellee Corvick.

Before BAZELON, Chief Judge, and TAMM and LEVENTHAL, Circuit Judges.

TAMM, Circuit Judge:

The appellant in this case brought suit in the district court to recover compensatory and punitive damages for extensive damage to her home and to personal property contained therein, alleging that the proximate cause of the damage was the negligent and/or willful, wanton, and reckless manner in which defendant Corvick constructed storm sewers for defendant the District of Columbia on property adjacent to and contiguous with appellant's home.[1] The Travelers Indemnity Company was also named as a defendant below on the basis of a policy of insurance which appellant carried with that company which covered her real estate and personal property thereon.

This appeal alleges error in the disposition of the case in the trial court, wherein directed verdicts were entered in favor of defendants the District of Columbia and The Travelers Indemnity Company (J.A. 150) and a jury verdict was rendered in favor of defendant Corvick. (J.A. 192.) The issues raised by the appellant, as stated in her brief, are set forth in the margin.[2]

We have given each of appellant's contentions careful consideration; in our opinion the only matter which merits extensive analysis is the controversy over whether the damage suffered by Mrs. Souza's property was covered by the terms of her "homeowner's" insurance policy. The trial judge concluded as a matter of law that this damage was not covered by the policy and accordingly granted the directed verdict in favor of Travelers. (J.A. 150.) We agree with this conclusion as applied to the damage to Mrs. Souza's personalty. However, for reasons set forth below, we feel Mrs. Souza may be entitled to a recovery for at least some of the damage to her realty. We therefore hold that the trial judge erred in granting the directed verdict in favor of Travelers as to the realty.

### I.

The "homeowner's" policy which was in force for Mrs. Souza's property at the time of the losses here relevant provided in pertinent part:

COVERAGE A—DWELLING

\*     \*     \*     \*     \*     \*

PERILS INSURED AGAINST

This policy with respect to Coverages A \* \* \* insures against all risks of physical loss \* \* \* except as excluded or limited herein.

\*     \*     \*     \*     \*     \*

SPECIAL EXCLUSIONS

*This policy does not insure against loss:*

(a) by wear and tear, deterioration, \* \* \* settling, cracking, shrinkage, bulging or expansion of pavements, pat-

---

1. Appellant contends that vibrations resulting from Corvick's use of heavy equipment, particularly an "Arrow tamper"—a "machine which hydraulically propelled a 1,000 pound chisel-headed drop-weight into the concrete road surface at a rate of fifty times per minute" (Brief for Appellant at ix.), caused the damage to her home and furnishings.

2. Brief for Appellant at v:

*Issues Presented*

(I)

Whether Section 12–309, District of Columbia Code (1967), and the evidence presented to [sic] the close of plaintiff's case-in-chief, required the direction of a verdict in favor of defendant District of Columbia.

(II)

Whether the contract of insurance between The Travelers Indemnity Company and plaintiff, and the evidence presented to [sic] the close of plaintiff's case-in-chief, required the direction of a verdict in favor of Travelers.

(III)

Whether the transcript of the trial demonstrates that substantial justice was afforded plaintiff in the District Court.

ios, foundations, walls, floors, roofs or ceilings * * * unless loss by fire, smoke * * *, explosion, collapse of building, water not otherwise excluded or glass breakage ensues. * * *

(b) * * * caused by, resulting from, contributed to or aggravated by any earth movement, including but not limited to earthquake, landslide, mudflow, earth sinking, rising or shifting; unless loss by fire, explosion or breakage of glass * * * ensues. * * *

(J.A. 41–42.)

COVERAGE C—
   UNSCHEDULED PERSONAL
        PROPERTY

    \*    \*    \*    \*    \*    \*

PERILS INSURED AGAINST

This policy insures * * * against direct loss to the property covered * * by following perils as defined and limited herein:

    \*    \*    \*    \*    \*    \*

4. *Explosion.*

    \*    \*    \*    \*    \*    \*

10. *Vandalism and malicious mischief*, meaning only the wilful and malicious damage to or destruction of the property covered. * * *

(J.A. 37.)

▆▆▆ With regard to the personal property, the insurance contract was a "specific risk" policy which covered only items brought within eighteen specifically enumerated causes of damage. Appellant sought to bring her loss within either item 4, "explosion," or item 10, "vandalism and malicious mischief."

In an effort to recover for damage caused by explosion, appellant charged in her complaint that Corvick "blasted" in constructing sewers near her home (J.A. 23); we are satisfied that the record clearly shows that no blasting took place as this term is generally used.[3] In the cross-examination of Mrs. Souza the following dialogue took place:

Q. When and where was the blasting?

A. Mr. Cooney, I did not police—It was only when noise and vibrations were so deafening and excessive, and I just didn't stand out in the street where I would say was—This is just an opinion of where the big storm sewers went in the alleys. I wouldn't know. I'm not an engineer. All I know is of the machinery—dirt, deafening noise where you would have to scream to people in your home to speak, and picking up crushed, fallen and broken articles.

Q. For the reason that you have just stated, you came to the conclusion that there must have been blasting, is that correct?

A. I did not come to that conclusion. I know nothing of engineering. I know nothing of sewerage.

    \*    \*    \*    \*    \*    \*

Q. You have said we blasted. Have you any proof of any, that there was any blasting done by Corvick Construction Company? Yes or no can answer that.

A. I had only verbal proof.

(J.A. 100–01.) Later in the cross-examination counsel returned to this line of questioning:

Q. I'm not quite clear on the blasting. * * * Was there or was there not [blasting]? * * *

A. Mr. Cooney, I can't answer that by a yes or no.

(J.A. 117.) In order to refresh the appellant's memory, counsel then read to her the following statements from her pre-trial deposition:

Q. The only thing I am asking you is whether or not you have available to you now or will have available to you at the time of this trial of this matter any evidence to indicate that dynamite, nitro glycerine or any com-

---

3. On appeal appellant makes an ingenious argument that the meaning of "explosion" should be expanded to include the vibrations caused by heavy equipment used on construction projects. (Brief for Appellant at 15–19.) We are unpersuaded by this argument.

parable explosive was used by Mr. Corvick in the course of the construction of the sewer separation. * * * Do you have that?

A. That's a question that is peculiar—not the question itself is not peculiar but the only thing I know is that *something must have been used. I don't know.* I couldn't swear to it and put my hand on the Bible, but *something other than heavy machinery must have been used to cause this excessive damage.*

(J.A. 118–19) (Emphasis added.)

In these circumstances we feel it was perfectly proper for the trial judge to rule that no explosion occurred.[4] We also think the trial judge was correct in rejecting plaintiff's claim that "vandalism" or "malicious mischief" were involved here; there was absolutely no evidence introduced in support of these theories.[5] Since it was clearly Mrs. Souza's burden to prove that the damage to her personalty was caused by one of the specific "perils insured against" and she failed to meet this burden, it was proper for the trial judge to direct a verdict in favor of appellee Travelers as to the personalty claim.

---

4. During Corvick's presentation of his defense there were assertions that no blasting was done, including the following statements by Corvick himself:

   Q. Did you do any blasting on that job?
   A. No.
   Q. Do you know of anybody that did?
   A. No one.
   (J.A. 167.) The job inspector for the District of Columbia, Mr. McCarthy, also testified that there were no explosives used on this job:
   Q. Do you know whether any explosives or any sort of dynamite or other explosives were used in any of this construction?

   A. Not on this particular job there were none, no.
   (J.A. 177.) Because these statements occurred after the judge ruled that no explosion took place, we have not considered them in reviewing his ruling. They are merely indicative of the accuracy of the ruling.

## II.

Before examining the provisions of the insurance contract applicable to the real property, we must consider a very substantial defect in appellant's claim against Travelers for loss to her realty. This was her almost complete failure to introduce evidence as to the amount of damage to her realty. The extent of this failure is revealed in the following lengthy excerpt from the record:

THE COURT: * * * Tell me what the evidence is with respect to damages. I am not talking about physical damage to the building; I am not talking about cracks in the walls or various other rooms sunk, dining room sunk, sun room sunk. *What's the evidence of the damage, money-wise? What is the evidence as to the financial loss sustained by Mrs. Souza in this case?*

MR. MOORE: On the personal possessions—

THE COURT: Leave out the personal possessions. I am talking about the building and the grounds.

\* \* \* \* \* \*

THE COURT: *What's the evidence money-wise as to the damage of the*

---

5. Appellant's theory in support of the claim of "vandalism and malicious mischief" is that Corvick's "wilful refusal to discontinue or quiet in any way his work near her premises" and the fact that he made "no effort to avoid damaging her property" constituted "malicious acts" for which she should recover under the policy. (Brief for Appellant at 19.) Mrs. Souza therefore contends that, under the circumstances of this case, "a jury may have found that, under the terms of her policy with Travelers, Mrs. Souza was entitled to indemnity." (*Id.*) However, as appellee Travelers has noted in its brief, "nothing could be more demonstrative of the complete absence of malice in this case than the jury's verdict that defendant Corvick was not even guilty of ordinary negligence. * * *" (Brief for Appellees Travelers and Corvick at 11.) Once again, this is merely indicative of the accuracy of the judge's ruling; the ruling was completely justified as of the time it was made by the absence of evidence to prove the allegation.

*building other than the heating plant and the personal property?*

MR. MOORE: Well, Mr. Bradley Hall stated in effect that it simply could not be repaired.

THE COURT: O.K. Let's assume that's so. *What is the evidence as to what that is worth?*

MR. MOORE: Mrs. Souza testified she paid something like $60,000 for the house, and if the house cannot be repaired—

THE COURT: You mean it's valueless?

MR. MOORE: It's not completely valueless.

THE COURT: You mean the jury has evidence from which they could find $60,000 of damages?

MR. MOORE: *I just don't know, your Honor.*

THE COURT: *Neither do I. That's my point. What can the jury do by way of estimating the value of the damage to the property? What do they have on which to base a judgment?*

MR. MOORE: The jury has the testimony of Mrs. Souza.

THE COURT: What testimony?

MR. MOORE: On the damage to the structure itself.

THE COURT: I understand, but what's that worth? *What would it cost to repair it[?] Or, put another way, to what extent did that decrease the value of the property?* There are only two elements of damage that I can see. I'm not quite sure which would apply. One would be the cost of repairing it; the other might be the decrease in value as a result of the damage done to the property. *What evidence do you have on either of those bases?*

MR. MOORE: *Well, your Honor wouldn't let in the estimate.*

THE COURT: *Because you didn't offer any competent evidence.*

MR. MOORE: *We, unfortunately, weren't able to get those.*

THE COURT: *Well, that's not the Court's fault.* I'm asking you what evidence does the jury have with respect to the damage to the real property. * * *

MR. MOORE: I think the jury can draw from Mr. Bradley Hall, who is a builder. He gave them his opinion as an expert builder, on the damage. *I think they know enough from their own experience to know that a house like this will cost money to be repaired.*

THE COURT: *But how much money?*

MR. MOORE: *It would cost enough to get it repaired.*

THE COURT: *Well, how much? What is the evidence in this case as to how much it will cost?*

MR. MOORE: *Well, we have asked, your Honor, in our Complaint for a specific sum.*

THE COURT: *Yes, but you have no evidence to support that.*

MR. MOORE: Your Honor, Mr. Hall is a competent builder.

THE COURT: But he didn't give any figures. He wasn't qualified to give figures.

MR. MOORE: He said it could not be repaired.

THE COURT: I don't want to pursue this with you, Mr. Moore, but it is perfectly clear to me—and frankly, I will say this to you, and I am perfectly willing to put it on the record: I think it's too bad that Mrs. Souza has suffered this damage to her property. It seems to me, there ought to be some way that she could be compensated for it. *But I have a problem before me as to how she can be compensated against these defendants in the light of the evidence that's been introduced in this case.*

*If you will tell me how I can do it! If you will tell me what evidence there is in this case—and this it seems to me is a major item, other than the questions of whether the policy covers it. * * **

But on the major item which relates to the damage to the real estate, damage to the building and damage to the grounds * * * what evidence is there

as to what that cost, what that would cost to repair * * * ?

MR. MOORE: *This is one of these situations in life, your Honor, when you sometimes can't get exact evidence.*

THE COURT: I don't know why you couldn't in this case. Certainly there must be experts in this community who could testify what it would cost to repair the damage to the house.

MR. MOORE: We attempted to find out from Mr. Bradley Hall and your Honor wouldn't allow—

THE COURT: Mr. Hall didn't have the background for any such testimony. He wasn't familiar, he said, with what needed to be done even, did he? Didn't he say he didn't know that excavations would have to be done, what foundations would have to be repaired?

MR. MOORE: That's the difficulty with this house your Honor. Until you actually dig up * * * [you must] dig up all around the house to find out what the damage is to the footings. * *

THE COURT: Mr. Moore, all I know is, I have to decide this case on the basis of the evidence introduced in the case during the course of the trial. Now you tell me what evidence there is upon which a jury can make a finding as to damage done to the real estate—. * *

MR. MOORE: I believe that they could find, your Honor, from the—

THE COURT: What is the evidence on which you base that belief?

MR. MOORE: The testimony of the witnesses on the extent of the physical damage to the structure itself. *These jurors are familiar with costs these days*

on repairing buildings. *That's an area that they have knowledge on.*

THE COURT: You've got on the jury a letter carrier, a clerk in the USAF, you have a display artist at Woodward & Lothrup's [*sic*], one is a secretary at the Bureau of Standards, another is a painter, another who is a clerk. I just mention this by way of example. *Do you think they are qualified to make a determination as to—*

MR. MOORE: *I think they are.*

THE COURT: *I'm sorry. I have to disagree with you, Mr. Moore.*

*Is that all you can say to me?*

MR. MOORE: *Yes, your Honor.*

(Tr. 300–06) (Emphasis added.)

■■ Thus, with regard to virtually every item of realty there was no evidence of the amount of damage. If the absence of such evidence had been complete, the directed verdict would have been proper because the jury could not have been allowed to speculate what proper damages would be.[6] However, since there was competent evidence of the amount of damage to the heating plant—a bill for repairs performed by a plumbing and heating contractor (J.A. 273), the directed verdict in favor of Travelers as to the realty cannot be sustained solely on the ground that there was no proof of the amount of damage thereto.

### III.

We turn, therefore, to the narrow question of whether it can be said as a matter of law that the damage to Mrs. Souza's heating plant was not covered by

---

6. Appellant now contends that even if there were no competent evidence of the amount of damage to her realty, the trial judge should not have directed a verdict in favor of Travelers because doing so denied her substantial justice; instead, he should have dismissed the case without prejudice to Mrs. Souza. (Brief for Appellant at 19–24.) We reject this contention in the circumstances of this case because it is clear from the record (Tr. 275–278) that the trial judge did everything within his power and within reason to assist Mrs. Souza's counsel in presenting his case. We find it necessary to reach this point because although we eventually hold that the directed verdict in favor of Travelers as to Mrs. Souza's realty was improperly granted, we do not hold that Mrs. Souza should be allowed at retrial to introduce new evidence as to the amount of damage to her realty.

the terms of her insurance policy. The portion of the policy applicable to the realty provides for "all risks" coverage subject only to certain Special Exclusions. The exclusions relevant to the consideration of this case are those which exclude from the coverage of the policy loss caused by "settling" or "earth sinking" unless loss by fire, explosion, or other specifically enumerated catastrophe "ensues," in which event the company is responsible only for the "ensuing loss."

█ Here the burden is on Travelers to prove that the damage to Mrs. Souza's property is excluded from the coverage of her policy. The general rule, applied in numerous federal cases,[7] is as follows:

> In an action for a loss covered by an insurance policy, the burden is on the defendant insurer to show that the loss was excepted by the terms of the policy.

1A W. Barron & A. Holtzoff, Federal Practice and Procedure § 279, at 163 (Wright ed. 1960).

Appellant contends, quite logically, that since Travelers introduced no evidence showing that the damage to Mrs. Souza's realty was not covered by the policy, it did not sustain its burden of proof on this issue and the directed verdict in its favor was improper. However, even where the burden of proving an exclusion from the coverage of an insurance contract is on defendant insurer, he is sometimes entitled to a directed verdict at the close of plaintiff insured's case. In presenting its case an insured may introduce evidence indicating that the loss he suffered was excluded from the coverage of his policy. If the insurer moves for a directed verdict in such circumstances, the court is to "consider as true all the evidence introduced by the insured, draw all reasonable inferences therefrom which are favorable to the in-

sured and apply the law thereto." James v. Federal Ins. Co., 5 N.J. 21, 24, 73 A.2d 720, 723 (1950). If the court finds that the insured has in fact proven his opponent's case, the directed verdict on behalf of the insurer is proper. James v. Federal Ins. Co., supra. Cf. Hankel Printing Co. v. Illinois Mfrs. Casualty Ass'n, 240 Ill.App. 438 (1926).

█ Here plaintiff did introduce evidence tending to show that the damage to her realty fell within the exclusions to the general coverage of her insurance policy. In her testimony Mrs. Souza repeatedly spoke of the sinking of the house. Mr. Hall, a licensed contractor called by the plaintiff, testified that floors had sunk (Tr. 258–59) and, in describing this sinking, said, "[T]his is settlement, sir." (Tr. 260.) There was even evidence that the damage to the heating system resulting from the subsidence of the house. Mrs. Souza testified:

> The pipes under the crawl space had not broken. They had, because of the steady sinking, had pulled loose and water was not feeding.

(J.A. 59.) These are apparently the same pipes which the heating and plumbing contractor later repaired, and his bill for these repairs and for related work was the only competent evidence of the amount of damage presented at trial. Thus, even granting the plaintiff the inferences to which she is entitled, we feel she did prove that the subsidence of the house caused the only damage now in question.

It remains to be seen, however, whether a mere showing that the house subsided is enough to bring the damage to the heating plant within the exclusions for loss caused by "settling" or "earth sinking." On the record before us, we do not believe it is. Webster's New International Dictionary 2293 (2d ed. 1952)

---

7. *See, e. g.*, St. Paul Fire & Marine Ins. Co. v. Bachmann, 285 U.S. 112, 52 S.Ct. 270, 76 L.Ed. 648 (1932); Chase Rand Corp. v. Central Ins. Co., 152 F.2d 963 (2d Cir. 1945); Aetna Life Ins. Co., Hartford, Conn. v. Conway, 102 F.2d 743 (10th Cir. 1939); Aetna Ins. Co. of Hartford, Conn. v. Taylor, 86 F.2d 225 (5th Cir. 1936); Goodwin v. Maryland Casualty Co., 233 F.Supp. 81 (E.D. Okla.1964).

defines "settle" to mean, "[t]o sink gradually to a lower level; to subside, as the foundation of a house, etc." One of the meanings of "settlement" is "[t]he gradual sinking of a structure, whether by the yielding of the ground under the foundation, or by the compression of the joints or the material." (*Id.* at 2294.) These definitions indicate that "settling" is a slow process resulting from the condition of the ground or building. Although Mr. Hall, a building contractor, testified that the fairly rapid sinking involved here was "settlement," a close examination of his testimony suggests that he might well accept the definitions given above. The following colloquy took place between Mr. Hall and Mr. Cooney, counsel for the insurance company:

Q. Do you know what kind of soil this building is on?

A. No, sir.

Q. Isn't it pretty important to determine the soil that a building is on before—in order to find out what causes possible sinking?

A. That—I don't know whether I am capable of answering that question just exactly or not.

Q. You can probably answer it a lot better than I asked you. You go ahead.

A. The only thing I can say in answer to this, in my judgment and from my past experience, *this is not just exactly a normal settlement by any means. It is an unusual settlement as far as I am concerned.* I can't tell you what caused it and the type or condition of the soil under it.

Q. *Can you tell us what you mean by "an unusual"*—

A. *Well, it isn't unusual for a house, a new house, sometimes four or five years old to get settlement cracks and it isn't unusual in some instances* *to have a door that won't close properly.*

Q. We are not talking about a house four or five years old?

A. That's right.

Q. You realize—

A. This to my judgment, sir, is—well, the only thing I can say on this to you, this is settlement, sir. What it is from, I don't know.

(Tr. 259–60) (Emphasis added.) Judging from Webster's definitions and from Mr. Hall's description of a normal settlement, we believe "settling" should be interpreted to mean the gradual subsidence of a structure resulting from the condition of the ground. The term "earth sinking" presents a more difficult case, but we believe it should also be construed as meaning a subsidence resulting from the condition of the ground; several of the catastrophes grouped with "earth sinking"—"earthquake, landslide, mudflow"—normally are considered natural phenomena resulting solely from upheaval or disintegration of the ground.

The insurance company contends that these terms should be given a broader interpretation because of the context in which they appear. The company's interpretation of the exclusions is that loss caused by "settling" or "earth sinking" is excluded unless caused by an explosion or another of the catastrophes listed in the exclusions. On the basis of this interpretation it can be argued quite persuasively that the exceptions to the Special Exclusions indicate that the terms "settling" and "earth sinking" mean any subsidence of the ground *not* caused by one of the enumerated catastrophes; if these terms are read to mean only subsidence resulting from the condition of the ground, then the exceptions to the exclusions for "settling" and "earth sinking" caused by explosions and other catastrophes would appear to be surplusage.[8]

---

8. It can be argued that the exceptions to the exclusions for "settling" are not surplusage. Perhaps these exceptions are meant to cover situations such as that in which an explosion loosens the ground and causes a house to "settle" in the gradual manner described in Webster's and are not meant to cover situations

However, we do not think the exceptions to the exclusions are as clear and unambiguous as the insurance company would have us believe. The relevant language of Special Exclusion (a) is that "settling" is excluded "unless loss by fire, smoke * * *, explosion, collapse of building, water not otherwise excluded or glass breakage ensues. * * * " (J.A. 42.) Special Exclusion (b) states that "earth sinking" is excluded "unless loss by fire, explosion or breakage of glass constituting a part of the building(s) * * * ensues. * * * " (*Id.*) Since the most common meaning of "ensue" is "result from," the exclusion could be read to mean that loss caused by "settling" or "earth sinking" is excluded unless explosion, breakage of glass, or another of the specifically enumerated catastrophes *results from* the "settling" or "sinking." This interpretation does not seem very logical when considered in connection with the provision for explosion. However, with regard to the provision for breakage of glass, this almost certainly is the meaning which the drafters of the contract intended "ensue" to have; it is difficult to envision how breakage of glass could cause a building to subside. Perhaps the drafters intended the same "ensue" to convey different meanings. In any event, the language is ambiguous, and interpreting the ambiguities against the drafter, we feel it can be said that an insured could reasonably have believed that the exceptions to the Special Exclusions did not call for an expansive reading of the terms "settling" and "earth sinking."

To summarize, we feel Mrs. Souza did present evidence proving that the damage to her heating plant resulted from the subsidence of her house. However, we believe that at least at this stage of the proceedings, in the absence of evidence of special circumstances which would require a different interpretation of the Special Exclusions, these exclusions should not be interpreted as barring recovery for damage caused by the subsidence of Mrs. Souza's house if that subsidence resulted from something other than the condition of the soil. Finally, since it certainly can be inferred that the subsidence involved here resulted from something other than the condition of the ground, we cannot say as a matter of law that the damage to Mrs. Souza's furnace was excluded from the coverage of her policy.

Accordingly, we reverse and remand for a new trial on the issue of the liability of Travelers for the damage to Mrs. Souza's heating plant. At retrial the jury should be instructed that damages may not exceed the amount paid the heating contractor.

Reversed and remanded for proceedings consistent with this opinion.

in which a house subsides in the rapid manner described at trial by Mr. Hall because these forms of subsidence would not fall within the exclusion for "settling" in the first place. However, it seems these rapid forms of subsidence *would* fall within the exclusion for "earth sinking" because the word "sinking" normally does not connote any speed of subsidence. Thus, if the insurance company's interpretation of the exclusions is accepted, the exceptions would be surplusage at least with regard to the exclusion for "earth sinking."