# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 4, 2023        Decided June 21, 2024

No. 22-7136

3534 EAST CAP VENTURE, LLC AND MCCULLOUGH
CONSTRUCTION, LLC,
APPELLANTS

v.

WESTCHESTER FIRE INSURANCE COMPANY AND ENDURANCE
AMERICAN INSURANCE COMPANY,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-02946)

———

*C. Thomas Brown*, pro hac vice, argued the cause for appellants. On the briefs were *Mitchell Y. Mirviss*, *Elizabeth Clark Rinehart*, and *Erik Broch Lawson*.

*Philip C. Silverberg* argued the cause for appellees. With him on the brief was *James P. Steele*.

Before: PILLARD and KATSAS, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

2

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*:  This appeal turns on whether two insurance policies provided coverage when vapor inside the insured building condensed into water during a period of cold weather.  The water then damaged the building.  The policies at issue cover loss caused by water damage but exclude loss caused by atmospheric dampness or temperature changes.  The exclusion contains an exception if a loss "by an insured peril ensues."  We hold that this ensuing-loss clause applies to losses from water damage caused by the excluded perils of dampness and temperature changes.  Accordingly, the policies cover the losses at issue here.

I

Plaintiff 3534 East Cap Venture, LLC, a real-estate developer, hired plaintiff McCullough Construction, LLC to build a residential and retail complex on East Capitol Street in the District of Columbia.  Defendants Westchester Fire Insurance Company and Endurance American Insurance Company issued identical builders' risk insurance policies, which covered the building while it was under construction.  Under the respective policies, each insurer is responsible for half of any qualifying losses.

As with many insurance policies, coverage here turns on the cause of any losses.  The policies cover "LOSS … caused by or resulting from WATER DAMAGE."  J.A. 36.  On the other hand, the policies exclude loss caused by "dampness of atmosphere" or by "[e]xtremes or changes in temperature."  *Id.* at 48.  But the exclusions contain an exception if "LOSS by an insured peril ensues."  *Id.*  The exclusions and the ensuing-loss exception appear in this provision:

This Policy does not insure LOSS caused by any of the following, unless direct physical LOSS by an insured peril ensues and then this Policy insures only such ensuing direct physical LOSS:

1. Corrosion, decay, deterioration, erosion, evaporation, inherent vice, latent defect, leakage, loss of weight, rust, shrinkage, wear and tear or any quality in property which causes it to damage or destroy itself.

2. Normal settling, shrinking, cracking, expansion or contraction.

3. Dryness or dampness of atmosphere.

4. Extremes or changes in temperature.

*Id.*

While construction was ongoing, the builder discovered water throughout the building. As it turned out, the architect's plans had failed to include a vapor barrier to prevent humid air inside the building from reaching cold, exterior-facing surfaces and then condensing into water. As a result, moisture under the roof condensed during a spell of cold weather. The water then seeped into and soaked building materials such as wood, insulation, and drywall. Deposition testimony indicated that water fell from the ceiling "[l]ike rain drops." J.A. 1213. The builder was forced to replace the damaged materials, at a cost of nearly $1.5 million. The insureds filed claims under the policies, and the insurers denied coverage.

The insureds sued in the Superior Court of the District of Columbia. The insurers removed the case to federal district court based on diversity of citizenship. After fact discovery,

all parties moved for summary judgment on the question of liability under the policies.

The district court ruled for the insurers. *3534 E. Cap Venture, LLC v. Westchester Fire Ins. Co.*, 633 F. Supp. 3d 123 (D.D.C. 2022). It held that the exclusions for losses caused by "dampness of atmosphere" or "changes in temperature" applied by their terms. *See id.* at 127–30. Further, it held that the ensuing-loss exception to the exclusions did not apply because losses from "water damage" to the building were "inextricably intertwined" with—and indeed were "one and the same" as—losses covered by the dampness and temperature exclusions. *See id.* at 130–31 (cleaned up).

II

We review orders granting or denying summary judgment *de novo*. *Friends of Animals v. Jewell*, 824 F.3d 1033, 1040 (D.C. Cir. 2016). A district court should grant summary judgment if there is "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). A dispute is "material" if its resolution could affect the outcome and is "genuine" if a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

The insurance policies at issue are governed by District of Columbia law. Under D.C. law, courts construe insurance policies "according to contract principles"—that is to say, "in a manner consistent with ordinary speech." *Stevens v. United Gen. Title Ins. Co.*, 801 A.2d 61, 66 (D.C. 2002). In "cases of doubt," ambiguities are resolved "against the insurer who drafted the contract." *Cameron v. USAA Prop. & Cas. Ins. Co.*, 733 A.2d 965, 968 (D.C. 1999) (cleaned up). Moreover, policy exclusions "will be construed narrowly." *In re Est. of Corriea*, 719 A.2d 1234, 1243 (D.C. 1998). Indeed, a long line of D.C.

precedent requires an insurer "to spell out in plainest terms—terms understandable to the man in the street—any exclusionary or delimiting policy provisions." *Travelers Indem. Co. v. United Food & Com. Workers Int'l Union*, 770 A.2d 978, 986 (D.C. 2001) (quoting *Cameron*, 733 A. 2d at 968 and *Holt v. George Washington Life Ins. Co.*, 123 A.2d 619, 621 (D.C. 1956)).

The parties debate at length what caused the harmful condensation. According to the insureds, the relevant dampness and temperature were not unusual, so the lack of a vapor barrier was its sole cause. Moreover, they say, the "dampness of atmosphere" refers to humidity outside but not inside the building. For these reasons, they contend that the exclusions do not apply. The insurance companies vigorously contest all of these points. We need not resolve them because we conclude that, if the exclusions apply, the ensuing-loss exception also applies and provides coverage here.

The policies at issue exclude coverage for losses "caused by" either "dampness of atmosphere" or "changes in temperature," "unless direct physical LOSS by an insured peril ensues." J.A. 48. For the sake of argument, we assume that the loss here was caused by "dampness of atmosphere" and "changes in temperature," as the insurers urge. But it also was physical loss more directly caused "by an insured peril," namely water damage. The policies provide coverage for losses "caused by or resulting from WATER DAMAGE." *Id.* at 36. They define "water damage" broadly to include "[a]ll water damage, except LOSS caused by or resulting from the peril of FLOOD," *id.* at 61, which triggers separate coverage provisions, *id.* at 36. And they define "flood" to exclude "the accumulation of water from any source on a roof or other surface of a building, dwelling or structure," *id.* at 59, thus

confirming that "accumulation of water" inside the building is a type of "water damage." The damage here—caused by liquid water that had accumulated inside the building—clearly was "LOSS by" the "insured peril" of "water damage." The only remaining question is whether the water damage "ensue[d]" within the meaning of the policy. The insurers contend that water damage did not *ensue* from dampness and temperature changes if the dampness and temperature changes directly caused the water damage. As explained below, we disagree.

When this Court, sitting in diversity, interprets D.C. law, "[o]ur duty … is to achieve the same outcome we believe would result if the District of Columbia Court of Appeals considered [the] case." *Novak v. Cap. Mgmt. & Dev. Corp.*, 452 F.3d 902, 907 (D.C. Cir. 2006). For three reasons, we think the D.C. Court of Appeals would conclude that the water damage here ensued from the dampness and temperature changes. First, that Court has instructed that insurance policies should be construed "consistent with ordinary speech." *Stevens*, 801 A.2d at 66. And in ordinary speech, *ensue* means "to take place afterward or as a result." *Ensue*, *Merriam-Webster Dictionary*; *see also Ensue*, *American Heritage Dictionary of the English Language* (same); *Ensue*, *Oxford English Dictionary* ("To occur or arise subsequently"; "To follow as a result"). In this case, the water damage occurred both after and (we assume) as a result of excluded causes of dampness and temperature changes. Second, in construing an ensuing-loss clause, this Court has stated that "the most common meaning of 'ensue' is 'result from.'" *Souza v. Corvick*, 441 F.2d 1013, 1022 (D.C. Cir. 1970). The clause at issue in *Souza* excluded coverage for losses caused by ground settling or sinking, unless losses caused by fire, explosion, or other specified events "ensue[d]." *See id.* at 1020. We construed this clause to mean that losses from settling or

sinking are excluded *unless* one of the specified events "*results from* the 'settling' or 'sinking.'" *Id.* at 1022 (emphasis in original). So, for example, if sinking severed a powerline and thereby caused a fire inside the insureds' house, the policy would cover the fire damage. *See id. Souza* was decided when this Court still issued precedential opinions on matters of D.C. law, so the D.C. Court of Appeals regards it as a binding precedent. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971). And *Souza* points in the same direction as the dictionaries— losses from water damage *ensued* from the dampness and cold if the water damage *resulted from* those causes. Finally, two interpretive presumptions favor the insureds—the rule that ambiguities must be resolved against the insurer, *Cameron*, 733 A.2d at 968, as well as the rule that policy exclusions must be construed narrowly, *In re Est. of Corriea*, 719 A.2d at 1243. Both presumptions apply because a construction of *ensues* to mean "results from" as well as "happens later" is at a minimum reasonable, which is enough at least to create ambiguity favoring the insureds. *See Am. Bldg. Maint. Co. v. L'Enfant Plaza Properties, Inc.*, 655 A.2d 858, 861 (D.C. 1995) ("Contractual language is ambiguous if it is susceptible of more than one reasonable interpretation.").

Even if D.C. law were unclear on this point, Maryland law reinforces our conclusion. In diversity cases governed by D.C. common law, we give Maryland law special consideration because the District derives its common law from Maryland's. *Conesco Indus., Ltd. v. Conforti & Eisele, Inc.*, 627 F.2d 312, 315–16 (D.C. Cir. 1980). And Maryland law construes ensuing-loss clauses consistent with our analysis above. For example, under Maryland law, a policy excluding "*explosions of any kind*, unless fire ensues" provides coverage for fires caused by explosions. *See Transatlantic Fire Ins. Co. of Hamburg v. Dorsey*, 56 Md. 70, 77–80 (1881); *see also*

*McEvoy v. Sec. Fire Ins. Co. of Baltimore*, 73 A. 157, 160 (Md. 1909) (policy covers "loss caused by fire ensuing from" excluded causes). *Selective Way Insurance Co. v. National Fire Insurance Co.*, 988 F. Supp. 2d 530 (D. Md. 2013), which the insureds highlight for us, applies these precedents. The policy there covered loss caused by water damage, excluded loss caused by faulty workmanship, and contained an exception to the exclusion if the faulty workmanship "result[ed] in" a covered cause. *See id.* at 532. The court described the exception as an "ensuing loss" clause, which it construed to mandate coverage for water damage caused by faulty workmanship. *Id.* at 538. Accordingly, there is "good reason to think that Maryland law" requires a broad reading of ensuing-loss clauses to provide coverage whenever an insured peril is a "direct cause of the loss," even if the insured peril was itself caused by an excluded peril. *Bethany Boardwalk Grp. LLC v. Everest Sec. Ins. Co.*, 611 F. Supp. 3d 41, 57–58 (D. Md. 2020). This rule favors the insureds here, for the water damage in this case—an insured peril—directly caused the loss regardless of whether it resulted from excluded causes of humidity and cold temperature.

We recognize that decisions across the country are divided on this issue, but we note one more that seems to us persuasive. *Blaine Construction Corp. v. Insurance Company of North America*, 171 F.3d 343 (6th Cir. 1999), involved a policy that included coverage for losses caused by water damage, excluded coverage for losses caused by faulty workmanship, and contained an ensuing-loss exception to the exclusion. *See id.* at 349–50. The contractor failed to seal a vapor barrier in the insured building, which caused moisture to condense, which in turn caused "water damage to the insulating material." *Id.* at 350. Applying Tennessee law, the Sixth Circuit construed the ensuing-loss provision to mandate coverage

because the excluded peril (faulty workmanship) caused an insured peril (water damage). *See id.* The Court rejected a contention that "an ensuing loss, to be covered, must be the result of a new, separate, and independent peril from the peril that is excluded, rather than a loss that follows naturally and ordinarily from an excluded peril." *Id.* (cleaned up).[1]

The district court reached the opposite conclusion here based on its view that the excluded perils (atmospheric dampness and temperature changes) were "inextricably intertwined with the ensuing peril of water damage." 633 F. Supp. 3d at 131 (cleaned up). Indeed, the court went so far as to describe the excluded and included causes here as "one and the same," because the "increase in humidity and change in temperature led directly to" the damaging condensation. *Id.* That is a difficult position to maintain in construing policies that by their terms distinguish between water damage (which they treat as an insured peril) and atmospheric dampness and temperature changes (which they treat as excluded perils). Indeed, it is a difficult position to maintain in construing any ensuing-loss provision distinguishing between an excluded peril and an insured peril that ensues.

All of that said, we acknowledge some authority for denying coverage where an excluded peril is inextricably intertwined with an ensuing and insured peril. *See*, *e.g.*, *Aetna Cas. & Surety Co. v. Yates*, 344 F.2d 939, 941 (5th Cir. 1965) (to be covered, ensuing insured peril must "be in some sense separable" from excluded peril); *Bethany Boardwalk*, 611

---

[1] *Blaine Construction* also narrowly construed exclusions for dampness of atmosphere and temperature changes to refer only to weather conditions outside the insured building. *See* 171 F.3d at 351–54. Given our analysis of the ensuing-loss provision in this case, we need not address that question.

F. Supp. 3d at 60 (denying coverage where it was "conceptually impossible to disentangle the damage caused" by the excluded and ensuing insured perils). These cases reason that an ensuing-loss clause requires some degree of distinctness between the excluded peril and the ensuing insured peril, lest coverage for the ensuing cause "very nearly destroy" the exclusion. *See Yates*, 344 F.2d at 941. We need not take a position on this question. Here, the excluded perils—dampness of atmosphere and change in temperature—are not inextricably intertwined with the covered ensuing peril of water damage in the sense that the former always cause the latter. Humidity and temperature changes may damage a building without causing significant condensation. For example, humidity may warp wood, and temperature changes may lead to cracks in masonry. Thus, interpreting *ensues* to mean "results from" as well as "happens later than," consistent with its ordinary meaning, still leaves meaningful application for the dampness and temperature exclusions.

Finally, we note that *Yates*—the case invoked most heavily by the insurers—involved losses treated as not involving "water damage" under the governing policy. In *Yates*, the policy excluded loss caused by rot, mold, or dampness of atmosphere, but the exclusion did not "apply to ensuing loss caused by … water damage." 344 F.2d at 940–41. The loss happened when humid air trapped in an unvented crawl space, hitting subfloors chilled by air conditioning, "produced condensation of moisture and consequent rotting." *Id.* at 940. In denying coverage, the Court reasoned that "the rot may have ensued from the presence of water but not from water damage" within the ordinary meaning of that term. *Id.* at 941. Moreover, virtually any case involving both dampness and rot would involve some vapor condensing into water. *Id.* So if that were enough to establish ensuing "water damage," the

ensuing-loss exception would "very nearly destroy" the underlying exclusion. *See id.* The Court was careful to distinguish a hypothetical case involving "direct intrusion of water," which it said likely would involve "water damage." *See id.* And it noted the insurer's apparent concession that the ensuing-loss clause *would* provide coverage if "water damage ensued from an excluded loss"—for example, "if a rotted wall opened and admitted rain." *Id. Yates* thus turns not on whether an insured peril can "ensue" from an excluded peril, but on whether the rot in that case amounted to "water damage." *See Blaine Construction*, 171 F.3d at 353 (distinguishing *Yates*) ("In the case at bar … there is no contention that the insulation had rotted. Here the damage consisted of the direct intrusion of water ….").

This case is also different from *Yates*. For one thing, the policies here make clear that the term "water damage" includes "the accumulation of water" from any "roof or other surface" of the building. J.A. 59. And this case clearly does involve such an "accumulation" or "direct intrusion" of water. Uncontroverted deposition testimony indicated that the building was damaged when "drops of water" began "falling" from the ceiling "[l]ike rain drops." *Id.* at 1213. The district court itself aptly described the damaged building materials as "soaked." 633 F. Supp. 3d at 125. Moreover, to the extent the loss here resulted from mold in addition to water damage, *see id.* (noting "moisture and mold growth"), the policies here include coverage for losses caused by mold and other fungi, J.A. 36. So, unlike *Yates*, this case presents no concern about coverage effectively eviscerating an exclusion for losses from mold. On any reasonable understanding, the loss here flows from "water damage" distinct from the mere presence of dampness inside the building and low temperatures outside.

Accordingly, the ensuing-loss provision applies and mandates coverage for the losses claimed by the insureds.[2]

### III

The judgment of the district court is reversed, and the case is remanded with instructions to enter summary judgment for the insureds on the question of liability.

*So ordered.*

---

[2] The policies here contain a separate exclusion for the "Cost of Making Good" an engineering defect or faulty workmanship, subject to a qualification that "if direct physical LOSS by an insured peril ensues, then [the policies] will provide cover for such ensuing LOSS." J.A. 48. For reasons explained above, we conclude that the water damage here was an insured peril that "ensue[d]" from any engineering defect or faulty workmanship, thus making the exclusion inapplicable to the damages claimed here.