211 N.J. Super. 472 (1986)
511 A.2d 1278
ARISTON AIRLINE & CATERING SUPPLY COMPANY, INC., PLAINTIFF
v.
BRUCE FORBES, PRESIDENT, CENTURY HOMES, INC.; CENTURY HOMES, INC.; PENN REFRIGERATION SERVICE CORP.; THOMAS R. FINARELLI, INDIVIDUALLY; MCCAY CORPORATION; RAY HOULIHAN, INDIVIDUALLY; AETNA CASUALTY AND SURETY CO., INC.; AMERICAN INTERNATIONAL ADJUSTMENT CO., INC., DEFENDANTS.
Superior Court of New Jersey, Law Division Burlington County.
Decided January 2, 1986.
*474 Edwin M. Riddle for Plaintiff (Wells & Singer, attorneys).
Israel N. Eisenberg for American International Adjustment Co. (Stanley P. Stahl, attorney).
*475 A. Michael Barker for Aetna Casualty & Surety Co., Inc. (Horn, Kaplan, Goldberg, Gorny & Daniels, attorneys).
Joanne C. Graham for Bruce Forbes and Century Homes, Inc. (Parker, McCay & Criscuolo, attorneys).
Seymour E. Siegel for McCay Corporation and Ray Houlihan (Lewis, Siegel & Wood, attorneys).
Paul F. Gilligan, Jr. for Penn Refrigeration Service Corporation and Thomas R. Finarelli (Montano, Summers, Mullen, Manuel & Owens, attorneys).
HAINES, A.J.S.C.
Plaintiff Ariston is in the catering business, providing in-flight meal service to airlines. It owns and operates a large freezer warehouse facility constructed in 1979. In late 1982 and early 1983, the floor of the warehouse heaved and cracked, causing structural damage. This suit seeks recovery of its losses from two insurance carriers (Aetna Casualty and Surety Co., Inc. and American International Adjustment Co., Inc.) and others. Plaintiff has moved for partial summary judgment on the issue of coverage. This opinion concludes that coverage exists.
Aetna's policy provides:
This policy insures against all risks of direct physical loss subject to the provisions and stipulations herein and in the policy of which this form is made a part.
American's policy provides:
This policy insures against all risks of direct physical loss or damage occurring during the period of this policy to the insured property from any insured and external cause, ... except as hereinafter excluded.
Both policies contain exclusions upon which the carriers rely in arguing against the granting of the summary judgment motion. The exclusions are discussed below.

A. The Causes Contributing to the Loss.

Ariston's summary judgment motion relies upon an expert's report prepared for defendants. The report contains the following conclusions:

*476 It is our professional opinion that the heaving of the foundation and floor, with subsequent cracking of the floor slab, is a direct result of expansion and rising of the soil mass as a result of frost heave. It is apparent that the insulation system in the floor has failed to prevent penetration of the cold into the subsoil, causing a buildup of ice lenses and layers. The formation of these ice lenses and layers with their inherently high uplift pressures have caused the footings, walls and floor slabs to rise and produced severe cracking in the concrete floor slab.
The report also discusses the causes of soil heaving and states:
The most probable cause of heaving here is due to frost heave. For frost heave to occur, three conditions must exist:
1. a frost susceptible soil
2. prolonged cold, i.e., temperature remaining at 32° F or less for at least 3 or 4 days
3. close proximity to the water table.
New Jersey soils typically are composed mainly of sands, silts and gravels in various combinations with some clays and occasionally highly organic soils such as peat found in the bogs of New Jersey. The worst soil combinations are uniform sands and silts and are classified as F-4 soils. They are the most susceptible to frost activity. These deposits are quite common in the Wrightstown area and a visual examination made of a sample obtained from beneath the floor slab (where heat tubes had been inserted in an attempt to thaw the ground) confirmed the subgrade as a silty sand, an F-4 classification. The source of cold far exceeds the threshold temperature of 32° F since the warehouse maintains temperatures consistently in the range of 0° F to - 10° F. These temperatures have been maintained since the warehouse was constructed in 1979. The third condition, which is the most variable in this case, is the proximity of the foundation and floor slab to the water table. In New Jersey, the water table fluctuates seasonably with snow melt and rainfall and after heavy prolonged periods of precipitation, such as has occurred this spring, the water tables are nearer the surface.
The mechanism that triggers frost heave occurs as the prolonged cold penetrates (with time) deeper into the soil and closer to the water table. As the water in the soil starts to freeze, it exerts a force (crystallization force) that seeks to draw more water to the surface of the ice crystal. This produces tension in the water within the pores of the soil causing the water to rise above the water table (capillary action). The water attracted to the ice crystal freezes and forms a still larger ice crystal that eventually becomes an ice lens or layer. These lenses and layers continue to grow and cause massive heaves that exert tremendous pressures that can lift structures. These forces have been measured to be as high as 4 million pounds per square foot (or 2,000 tons per square foot) and in some parts of the United States, have caused heaves of 5 feet or more.
It is apparent that the conclusions of defendants' expert as to the causes of damage to the warehouse include design or *477 construction defects. Plaintiff does not disagree; its complaint against other defendants is based upon such claims.
The record upon which all parties to the summary judgment motion rely discloses the following as the causes contributing to plaintiff's loss:
(1) Design and/or construction defect
(2) Expansion and rising of the soil mass
(3) Proximity of water and the water table
(4) Type of soil
(5) Persistence and penetration of cold leading to the formation of ice lenses
(6) Expansion of the ice lenses over time.

B. Policy Coverages.

Aetna's policy insured plaintiff's building "against all risks of direct physical loss" subject to exclusions. American's policy contains similar language insuring the building against "all risks of direct physical loss or damage occurring ... from any insured and external cause," subject to exclusions. An "external cause," referred to only in the American policy, excludes three types of losses from coverage: losses (1) caused by the owners negligence, (2) caused by normal wear and tear, and (3) resulting from internal decomposition or deterioration. Contractors Realty v. Ins. Co. of No. America, 469 F. Supp. 1287, 1293 (S.D.N.Y. 1979); N-Ren Corporation v. American Home Assurance Co., 619 F.2d 784, 787 (8 Cir.1980). The exclusions upon which Aetna relies are those which state that the policy does not insure against:
D. Loss caused by, resulting from, contributed to or aggravated by any of the following:
1. earth movement, including but not limited to earthquake, landslide, mudflow, earth sinking, earth rising or shifting;
....
4. water below the surface of the ground including that which exerts pressure on or flows, seeps or leaks through sidewalks, driveways, foundations, walls, basement or other floors, or through doors, windows, or any other openings in such sidewalks, driveways, foundations, walls or floors....
E. Loss caused by:

*478 1. wear and tear, deterioration, rust or corrosion, mold, wet or dry rot, inherent or latent defect; .. . settling, cracking, shrinkage, bulging or expansion of pavements, foundations, walls, floors, roofs or ceilings ...; unless loss by a peril not otherwise excluded ensues and then the Company shall be liable for only such ensuing loss....
The exclusions upon which American relies are those which state that its policy "does not insure against loss or damage caused by or resulting from":
....
(C) Errors in design, errors in processing, faulty workmanship or faulty materials, unless the collapse of the property or a part thereof ensues and then only for the ensuing loss;
....
(H) Loss or damage caused by or resulting from subsidence, cracking, settling, shrinkage, or expansion in foundations, walls, floors, ceilings or patios.
Strict construction of insurance policy exclusions is the basic rule. Butler v. Bonner & Barnewall, 56 N.J. 567, 576 (1970). Policies are to be read liberally to the end that coverage is provided. Kievit v. Loyal Protective Life Ins. Co., 34 N.J. 475, 482 (1961). Exclusions must be specific not general. Capece v. Allstate Ins. Co., 88 N.J. Super. 535, 541 (Law Div. 1965). The maxim "contra proferenteum [against the party which proffers] has special relevance when an insurer fails to use apt words to exclude a known risk...." Pan American World Air, Inc. v. Aetna Cas. & Surety Co., 505 F.2d 989, 1000 (2d Cir.1974). In Pan American the court elaborated by saying:
[This maxim] defines the scope of coverage as much as if it were a clause in the all risk policies. It is part of the understanding of the parties. The experienced all risk insurers should have expected the exclusions drafted by them to be construed narrowly against them and should have calculated their premiums accordingly. [at 1003-1004]
The reasonable expectations of the insured are to be considered. Harr v. Allstate Ins. Co., 54 N.J. 287 (1969). In Harr the Court stated the general rule of construction as follows:
... Our expressions have come in a variety of issues and contexts, but all have indicated as their keystone the goal of greater protection to the ordinary policy holder untutored in the intricacies of insurance. We have realistically faced up to the fact that insurance policies are complex contracts of adhesion, prepared *479 by the insurer, not subject to negotiation, in the case of the average person, as to terms and provisions and quite unintelligible to the insured even were he to attempt to read and understand their unfamiliar and technical language and awkward and unclear arrangement.... We have stressed, among other things, the aim that average purchasers of insurance are entitled to the broad measure of protection necessary to fulfill their reasonable expectations; that it is the insurer's burden to obtain, through its representatives, all information pertinent to the risk and the desired coverage before the contract is issued; and that it is likewise its obligation to make policy provisions, especially those relating to coverage, exclusions and vital conditions, plain, clear and prominent to the layman.... [Id. at 303-304]
Both policies in question here are "all-risk" policies. Aetna's policy covers "all-risks of direct physical loss," American's, "all-risks of direct physical loss or damage." Courts have construed this language as creating all risks coverage. N-Ren Corporation v. American Home Assurance Co. Standard Structural Steel Co. v. Bethlehem Steel Corp., 597 F. Supp. 164 (D.Conn. 1984), defined "all risk" as follows:
The label "all risk" is essentially a misnomer. All risk policies are not "all loss" policies; all risk policies, including the policy at issue here contain express written exclusions and implied exceptions which have been developed by the courts over the years. However, the language of all risk policies is not to be given a restrictive meaning. In a nutshell,
"a policy of insurance insuring against `all risks' is to be considered as creating a special type of insurance extending to risks not usually contemplated, and recovery will usually be allowed, at least for all losses of a fortuitous nature, in the absence of fraud or other intentional misconduct of the insured, unless the policy contains a specific provision expressly excluding loss from coverage." Annot. 88 ALR2d 1122, 1125 "Coverage Under `All Risks' Insurance" (1983). [at 191; citations omitted except as noted]
The court also said:
A fortuitous event is one which occurs accidentally, as a layman, and not a technician or scientist would understand that term.... In other words, bearing in mind the Court's narrow interpretation of insurance exceptions, including those implied by public policy, and the traditionally broad view of all risk coverage, damage is fortuitous [if] neither party knew or contemplated that there was any defect "at the time of the issuance of the insurance contract. Essex House v. St. Paul Fire and Marine Ins. Co., 404 F. Supp. 978, 988-989 (S.D.Ohio 1975). [Id. at 193]
American claims it did not issue an "all-risk" policy but rather a "difference in conditions" policy. The latter is said to be "one generally obtained for the purpose of providing coverage *480 which may not be available under other policies." The distinction, however, is not one which makes a difference here. The language of the American policy covered "all-risks of direct physical loss or damage." That is enough under the cases to require it to be treated as an "all-risk" policy and to be subjected to the rules above set forth.

C. The Exclusions.

(1) Design and/or Construction Defect.

A design or construction defect is a cause of loss said by Aetna to be excluded because its policy does not insure against loss caused by "wear and tear, deterioration ... inherent or latent defect." The terms are not explained in the policy. The loss was not occasioned by "wear and tear" or by "deterioration" unless the meaning of those words is stretched beyond ordinary expectations. Arguably, a design or construction defect may be "inherent" or "latent." The Oxford English Dictionary (Compact ed. 1971) defines "latent" as: "Hidden, concealed; present or existing, but not manifest, exhibited or developed." At 1576. Were Aetna's policy exclusion read in its favor with its definition in mind, it would exclude all of the causes of the loss in the present case. Soil, water, and ice problems were all "latent" in this sense. Nevertheless, Aetna saw fit to provide express references in its policy exclusions to "earth movement," "surface water," "water below the surface," "settling, cracking, shrinkage," and other events. Clearly, the drafters of the policy language did not think that the word "latent" was adequate to cover all of the mentioned exclusions. The fact that no express language excludes design or construction defects is significant. Under usual rules of construction, the exclusion of "inherent or latent defects" cannot be read as including such defects. The rules are set forth in In re Armour, 11 N.J. 257
This is an apt case for the application of the maxim noscitur a sociis [defined in Black's Law Dictionary as: "... known from it associates"] and the corollory rule of ejusdem generis, embodying the principle grounded in grammar, logic *481 and reason that associated words and phrases may be looked to for the significance of doubtful words, and where general words follow particular words, in an enumeration describing the subject, the general words are construed to embrace only objects similar in nature to those ennumerated by the antecedent's specific words. The word "other" will generally be read as "other such like," so as to restrict the meaning of the general terms to those of ejusdem generis, and thereby to give effect both to the particular and the general words. The particular words are treated as indicating the class, and the general words as comprehending all embraced in the class although not specifically enumerated. The antecedent's special words are essentially restricted; otherwise, they would have no meaning.
....
... If the general words are to have their natural meaning, in the abstract, then the antecedent particularization would be utterly vain, for the general class would encompass the particular enumeration. [at 273]
"Inherent" and "latent" are therefore words restricted to mean losses occasioned by such things as "deterioration" and "wear and tear," not by the causes contributing to Ariston's losses. Furthermore, this exclusion excepts loss from a "peril not otherwise excluded," in which case the company is liable for the "ensuing loss." Ariston's losses, as shown later, were caused by perils "not otherwise excluded."
American's policy illustrates the possibilities of better language when a carrier intends to exclude design and construction defects. Its policy states that it does not insure against loss or damage caused by or resulting from:
(C) errors of design, errors in processing, faulty workmanship or faulty materials, unless the collapse of the property or a part thereof ensues and then only for the ensuing loss.
This is clear language. It would exclude a loss caused solely by design or construction defect were it not for the exception relating to "collapse." The Oxford English Dictionary, supra, defines "collapse" as:
The action of collapsing, or of falling or suddenly shrinking together, breaking down, giving way, etc., through external pressure or loss of rigidity or support: originally a term of physiology and medicine.
Ariston's property "collapsed" in this sense. Consequently, American's exclusion does not apply.
*482 (2) Aetna, but not American, has excluded: "loss caused by, resulting from, contributed to or aggravated by:
earth movement, including but not limited to earthquake, landslide, mud flow, earth sinking, earth rising or shifting."
The words "earth movement," like other language in the policies being construed, must be read in the light of other words contained in the same exclusion. In re Armour, supra. Thus, in the present case, the words "earth movement" must be interpreted as referring to a natural phenomenon akin to earthquakes, landslides, mud flows, earth sinkings, and earth risings or shiftings. An earthquake, for example, is not the result of human activity. In the present case, the movement of water and ice coupled with freezing temperatures and design or construction defects caused the loss. Thus, "earth movement" resulted from other events, not all of which were natural. The language of the policy is, at best, far from clear as to what is meant by "earth movement." When insurance language is not clear, it must be read, if possible, as providing coverage.
Wyatt v. North Western Mut. Ins. Co., 304 F. Supp. 781 (D.Minn. 1969), recognized the difficulty of "earth movement" language:
It seems hard to contend that the insurance policy meant to exclude all earth movements, for it is difficult to distinguish between a situation where a piece of heavy equipment breaks lose and hits a house causing serious damage and a situation where that equipment instead hits only an embankment next to the house but causes the earth to move and thereby damages the house. [at 783]
It held that the language excluding "earth movement" was
... designed and intended to exclude from coverage damage from natural causes and natural phenomenon, i.e., earthquakes, landslides, mud flow and other similar occurrences but that where the proximate and efficient cause of damage definitely is the action of a third party, this exclusion does not apply even though the actions of such third-party may have incidentally caused some "earth movement." [Id. at 782-783]
In Wyatt the court refused to exclude coverage if a cause in addition to movement of the earth contributed to the loss. The same reasoning is appropriate here.
In Peach State Uniform Service v. Amer. Ins. Co., 507 F.2d 996 (5th Cir.1975) the court considered a claim based upon the *483 collapse of a foundation due to the removal or erosion of earth. The court found coverage, limiting the words "earth movement" to "phenomena related to forces operating within the earth itself, and not to the merely superficial effects of external forces such as erosion by run-off water." In Gov. Employees Ins. Co. v. De James, 256 Md. 717, 261 A.2d 747. (Ct.App. 1970), the court construed the words "earth movement" to "mean unusual movement of the same nature and character as those specified." . In Gullett v. St. Paul Fire and Marine Ins. Co., 446 F.2d 1100 (7 Cir.1971), the court considered an exclusion of loss "caused by, resulting from, contributed to, or aggravated by ... earthquake, volcanic eruption, landslide or any other earth movement." It held that a building loss caused by the collapse of a retaining wall supporting an earth embankment was covered. It limited the exclusion of "earth movement" to the types of such movement specified in other language of the exclusion. In Sauza v. Corvick, 441 F.2d 1013 (D.C. Cir.1970), the court held that "settling" or "earth sinking" referred to "gradual subsidence of a structure resulting from the condition of the ground." Id. at 1021. Consequently, the settling of a building caused by an adjoining excavation was covered. The Annotation, "Insurance-Earth Movement or Earthquake," 44 A.L.R.3d 1316, 1319 (1972), referring to the instant exclusion, says that "the majority of courts have restrictively construed the term as applied to both occurrences primarily natural and to those nonnatural in character, so as to prevent the applicability of earth movement exclusions to the particular fact patterns presented in each case."
(3) Aetna's policy, but not American's, excludes loss caused by, resulting from, contributed to or aggravated by:
Water below the surface of the ground including that which exerts pressure on or flows, seeps, or leaks through sidewalks, driveways, foundations, walls, basement or other floors, or through doors, windows, or any other opening in such sidewalks, driveways, foundations, walls or floors.
The ice lenses in the present case consisted of frozen water. Ice and water, however, are not the same thing. It was not *484 water in a natural, liquid state which caused damage to the warehouse; it was ice, creating pressure, which caused damage. The exclusion makes no reference to ice, although it could easily have done so. Further, under the rule of ejusdem generis, the water to which the exclusion refers must be water which "flows, seeps, or leaks." The exclusion is dealing with water in liquid form, not frozen water. Nationwide v. Warren, 675 S.W.2d 402 (Ky. Ct. App. 1984) so held, stating that the exclusion referred to "natural deposits of liquids." Id. at 403-404.
The exclusion also denies coverage for any loss "contributed to" by water. Read literally, without an examination of any other exclusionary language, these words would deny coverage since water turned to ice which exerted pressure, moved earth, and caused damage. If so read, however, the exclusion would deny coverage whenever water was a factor in causing loss no matter how remote and no matter what other contributing factors were present. For example, if any underground stream, through erosion, caused the collapse of a roadway, resulting in vehicular damage to a building from a driver's loss of control, there would be no coverage. The subsurface water would have "contributed to" the loss. A contribution so remote cannot be read into the policy language and certainly could not have been within the expectations of the insured. Further, since "water" refers to a liquid, it will not be construed to include a loss caused by ice.
In Peach State Uniform Service, supra, the court addressed nearly identical language in an insurance policy said to exclude coverage for a building which collapsed when heavy rains washed out soils causing a foundation to fail. The court found coverage, restricting the language relating to "water" to "such harms as staining, rusting, or other incidents of the chemical presence of water, and not to the strictly kinetic effects of moving water." 507 F.2d at 999.
*485 Note, also, that the Aetna policy expressly refers to "freezing" in three other sections of its policy dealing with exclusions and, in one of them, to loss caused by "weight of ice or water." Thus, when damage caused by freezing or by ice was intended to be excluded, Aetna said so.
(4) The final exclusion upon which Aetna relies is that which denies coverage caused by:
Settling, cracking, shrinkage, bulging, or expansion of the pavements, foundations, walls, floors, roofs, or ceilings ... unless loss by a peril not otherwise excluded ensues and then the company shall be liable for only such ensuing loss.
American relies upon similar exclusionary language. Its policy denies coverage for:
Loss or damage caused by or resulting from subsidence, cracking, settling, shrinkage, or expansion in foundations, walls, floors, ceilings, and patios.
Since Aetna has not excluded loss caused by ice or by any of the other events which contributed to plaintiff's damage, this exclusion does not apply. The loss was caused by a "peril not otherwise excluded." There are additional reasons, however, for denying application of both Aetna's and the like American exclusion. Both refer to "settling" and "expansion." American also refers to "subsidence." It would be within the expectation of the parties that cracks in a building, as well as shrinking and bulging, when caused, for example, by normal settling or by expansion and contraction resulting from changes in temperature, would not be covered. Certainly, it was not their expectation or intention that cracking or bulging resulting from some unusual event, such as a vehicular collision, would be excluded. "Cracking," furthermore, is a result, not a cause. Were the policy to be read broadly in favor of the company, contrary to the proper rule, any minor initial cracking which later became so widespread as to destroy a building would provide a reason for denying coverage. The policy language cannot be so read. "Cracking" and "bulging," resulting from the application of some external force, as opposed, e.g., to the natural and expected settling of the building, is covered.
*486 American argues that a distinction should be made between major and minor cracks. The policy does not make that distinction and the argument clearly illustrates an ambiguity in the policy language which must therefore be interpreted in favor of coverage. Other courts have so held.
Nationwide v. Warren, supra, addressed facts similar to those present here. In that case, water from a damaged gutter ran under a foundation, froze, expanded and cracked the foundation. The owner's insurance policy contained water and cracking exclusions identical to those involved here. The court held that the exclusion had no application because the loss was caused by an external force. 675 S.W.2d at 404. To the same effect: Shaffer v. Phoenix Ins. Co., 21 Pa. D. & C.2d 79 (1959); New Hampshire Ins. Co. v. Robertson, 352 So.2d 1307, 1310 (Miss. 1977); Kane v. St. Paul Fire & Marine Ins. Co., 214 F. Supp. 178, 180 (W.D.Tx. 1963). Carriage Club v. Amer. Motorists Ins. Co., 643 S.W.2d 38 (Ct.App.Mo. 1982), dealt with a loss caused by frozen subsurface flood water which heaved certain tennis courts. The court held that the "earth movement" exclusion did not apply because the proximate cause of the loss was the deposit of the waters from the flood, id. at 40, and that the "cracking" exclusion did not apply because it dealt only with the "normal, gradual, readjustment of the building materials." Nida v. State Farm Fire and Casualty, 454 So.2d 328, 334.

D. Proximate Cause.

In addition to the fact that the exclusions upon which Aetna and American rely are not applicable for the reasons stated, an additional important reason makes them ineffective. Numerous cases hold that coverage is provided whenever the policy does not exclude the efficient cause of the damage even though it excludes other contributing causes. Thus, in Wyatt, supra, the court said: "It would appear that a distinction should be drawn between an excluded event which is the cause and such an event which is the inevitable result of another *487 event." 304 F. Supp. at 783. In Premier Ins. Co. v. Welsh, 140 Cal. App.3d 720, 189 Cal. Rptr. 657 (Ct.App. 1983), the court dealt with a damaged foundation caused by oversaturation of a subsurface drainage system during a heavy rain. The "earth movement" exclusion was argued. In finding coverage, the court looked at "the cause that sets the others in motion." Id. 189 Cal. Rptr. at 660. It held that if the efficient cause of the damage was not specifically excluded in the policy, there would be coverage even though other exempted causes contributed to the loss. Ibid.
New Jersey appears to have an even broader rule (although it has not addressed the particular exclusions here) as illustrated by Franklin Packaging Co. v. California Union Ins. Co., 171 N.J. Super. 188 (App.Div. 1979). In that case, vandals caused damage which resulted in blockage of a drain and resulting loss of inventory. Vandalism was a covered risk; water damage was not. The court held that there was coverage, citing 5 Appleman, Insurance Law and Practice (1970), § 3083:
Where a peril specifically insured against sets other causes in motion which, in an unbroken sequence and connection between the act and final loss, produced the result for which recovery is sought, the insured peril is regarded as the proximate cause of the entire loss. It is not necessarily the last act in a chain of events which is, therefore, regarded as the proximate cause, but the efficient or predominant cause which sets into motion the chain of events producing the loss. An incidental peril outside the policy, contributing to the risk insured against, will not defeat recovery ... In other words, it has been held that recovery may be allowed where the insured risk was the last step in the chain of causation set in motion by an uninsured peril, or where the insured risk itself set into operation a chain of causation in which the last step may have been an excepted risk. [at 309-311]
In the present case, the Appleman rule would require coverage. If the efficient cause of the loss was a design or construction defect, it was a cause which set in motion a series of events, the last of which was the formation of ice lenses and the consequent heaving of the earth which caused the damage. This opinion holds that both first and last events are covered. Either is enough.

*488 Conclusion

The losses suffered by Ariston are covered by the Aetna and American policies. Partial summary judgment is granted accordingly.