The BOSTON COMPANY REAL
ESTATE COUNSEL, INC.,
Plaintiff,

v.

The HOME INSURANCE COMPANY,
INC., Defendant.

Civ. A. No. 93–11122–PBS.

United States District Court,
D. Massachusetts.

May 8, 1995.

Michael B. Keating, Sarah Burgess Reed,
Foley, Hoag & Eliot, Boston, MA, for plaintiff.

R. Paul Roecker, Fitzhugh & Associates,
Bert J. Capone, Jr., David A. Grossbaum,
Peabody & Arnold, John M. Nelson, Ian M.
Veitzer, Michael A. Fitzhugh, Fitzhugh &
Associates, Boston, MA, for defendant.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### INTRODUCTION

Plaintiff, the Boston Company Real Estate Counsel, Inc. ("the Boston Company"), brings this action against the Home Insurance Company, Inc. ("Home Insurance") seeking insurance coverage under four "all-risk" insurance policies for severe foundational settlement damage to one of its buildings in Illinois. When Home Insurance denied coverage, the Boston Company filed this diversity action alleging breach of contract (Count I) and violations of G.L. c. 93A and G.L. c. 176D (Count II). Home Insurance has moved for summary judgment on both counts, but only as to the first two insurance policies covering the time period from September 1988 to September 1990 (Docket No. 53).[1]

After hearing, the Court *ALLOWS* the motion for summary judgment on Count I and Count II with respect to claims under the first and second insurance policies.

### UNDISPUTED FACTS

1. *The Building*

The settlement problem at 1501 Mittel Boulevard is well documented. Beginning in August 1984, consulting engineers O'Brien & Associates, Inc. sent a report to the builders, Itasca Construction Associates, Inc., indicating the existence of unsuitable soil materials beneath the surface and recommended various alternatives to deal with the situation.

---

1. The motion for summary judgment is unclear as to the policies for which defendant seeks summary judgment. At various points, counsel for both sides discuss the third and fourth policies. However, defendant's reply brief clarifies the matter.

(Def.Exh. 23). The report specifically stated possible settlement problems could occur. *Id.*

Sometime in 1985, construction of the building commenced. (Hicks Dep. at 9). Once construction was complete, O'Brien rendered another report to Itasca Construction on June 5, 1986 (the 1986 O'Brien report), which contained the following information: (1) From March 24, 1986 through May 7, 1986, "a total maximum settlement of approximately .05 to .10 [inches] has occurred"; (2) peat and organic deposit underlie the northern wing of the building; (3) a minimum of eight to ten feet of fill was placed over the peat and organic deposit from May 1984 through July 1985; (4) "it appears that primary consolidation of the peat and organic deposit is complete and secondary compression is occurring. Additional secondary compression is expected to continue and it is estimated that this consolidation will result in settlement of 1″ during the next 1000 days with an additional 1″ occurring over the following 9000 days"; and (5) "the settlement estimates are only approximate and secondary compression of organic materials can often be much larger." (Def.Exh. 2).

Itasca Construction forwarded the 1986 O'Brien report to Trammel Crow by letter dated June 11, 1986. (Def.Exh. 29). Based on the O'Brien report's conclusion that the majority of settling had occurred, construction of the building proceeded (Def.Exh. 29),[2] and on August 8, 1986, the northwest corner of the building was "mudjacked" (raised) six inches to compensate for the settlement which had occurred to date. (Pl.Exh. 15, at 5; Def.Exh. 30).

The settlement rate of the building exceeded expectations. (Pesak Dep. at 117). In fact, the overall settlement of the building has been repeatedly characterized as "not normal." (Pesak Dep. at 117, 129; Milton Dep. at 30; Def.Exh. G at 10). As of February 24, 1994, the northern portion of the building had experienced settlement ranging from 0.3 to 1.67 feet. (Pl.Exh. 13, at 1). The

primary cause of the continuing settlement problem is "the compressible organic deposit . . . which exists under this portion of the building." (Pl.Exh. 13, at 1). The organic materials consolidated due to the pressures from the building itself as well as the ten feet of compacted fill material which was placed over the organic material prior to construction. (Pl.Exh. 13, at 1; Pl.Exh. 19, at 1). Currently, the building is experiencing "secondary settlement" at a rate of one inch per year. (Pl.Exh. 13, at 2; Def.Exhs. 40, 47).

### 2. Trammel Crow

Trammel Crow's involvement dates back to the building's inception. A group of partners at Trammel Crow had been involved in the development and construction of the building, but had left Trammel Crow before Boston Company came into the picture. (Cobb Aff., para. 4; Novelli Aff. para. 3). This separate group of developers at Trammel Crow had possession of engineering reports from 1984 and 1986 which indicated some risk of settlement damage. (Itasca Dep. at 29). These Trammel Crow employees were also aware of the "mudjacking" operation. (Adamski Dep. at 51).

### 3. The Purchase

In January 1988, the Boston Company purchased the building at 1501 Mittel Boulevard in Woodale, Illinois, from the Trammel Crow Company. (Cobb Dep. at 13, 23). Prior to the sale, engineers hired by the Boston Company noted the need for some minor repairs but assessed the building as "well designed and constructed." (Pl.Ex. 6). Boston Company employees reviewed tenant files and ascertained that no complaints about the physical condition of the building had been lodged. (Pl.Exh. 15, at 5). At the time of the purchase, Boston Company employees also personally toured the facility and determined that it was in good condition. (Cobb Aff. para. 9).

According to the terms of the sale agreement, Trammel Crow's liability to Boston

---

**2.** What construction remained is unclear from the submissions. It appears that there remained some finish work for the tenant, United Airlines. (Hicks Dep. at 25). However, Itasca Construction's letter to Trammel Crow states, "we are going to proceed with construction of this project." (Def.Exh. 29).

Company for any defects in the building ended in January 1991. (Cobb Aff. para. 7; Cobb Aff.Exh. A).[3] The Boston Company also hired Trammel Crow to manage the building. (Def.Ex. 150). The Trammel Crow employees who managed the building on behalf of Boston Company after its purchase, however, had not been involved in the building's development or construction. (Cobb Aff. para. 6; Novelli Aff. para. 5). These employees were unaware of the 1986 "mudjacking" operation, (Novelli Aff. para. 7–8; but see Adamski Dep. at 25), and the Boston Company did not discover that the building had been mudjacked until this litigation ensued. (Mitchelson Aff. para. 4).

#### 4. *The Four Policies*

In September 1988, the Boston Company contracted with Home Insurance for the first of four "all-risk" insurance policies to cover the building. A second, identical insurance policy was issued for the period of September 1989 to September 1990. These two insurance policies contained exclusions for "damage caused by or resulting from ...

12. faulty workmanship, material, construction, or design from any cause, unless physical damage not otherwise excluded from this Policy results in which event, this Policy will cover only such resulting damage;

14. settling, cracking, shrinking, bulging, or expansion of pavements, foundations, walls, floors, or ceilings...."

(Def.Ex. 109). These policies also contained an endorsement of coverage for "Earth Movement, including but not limited to earthquake, landslide, or subsidence." (*Id.*)

In September 1990, Home Insurance issued a third insurance policy with the exclusions written somewhat differently. The faulty workmanship exclusion now excluded coverage only "... against the cost of making good defective design or specifications, faulty material, or faulty workmanship."

(Def.Ex. 111). This exclusion did not apply "to loss or damage resulting from such defective design or specifications, faulty material, or faulty workmanship." (*Id.*). The settlement damage clause only excluded "**normal** settling or shrinkage of walls, floors, or ceilings...." (*Id.*) (emphasis added). The proof of loss provision required the insured "to render a signed and sworn proof of loss to the Company or its appointed representatives." (Def.Exh. 111). In September 1991, Home issued a fourth insurance policy with the same provisions as the third policy.

#### 5. *Continuing Settlement Problems*

Seven months after the sale, in July, 1988, one Trammel Crow employee wrote to the building contractor: "[t]his building continues to sink! What do you propose?" (Def.Ex. 29; Itasca Dep. at 47–48; Hicks Aff., para. 4). Although the precise date is unclear from the record, at some point in 1990, the tenant (United Airlines) informed the Trammel Crow building management of serious settlement problems at the building. (UAL Dep. at 24, 26–27; List Aff. para. 2). In May of 1990, Trammel Crow retained Alta Engineering to assess the settlement situation. (List Aff. para. 2). Alta determined that the settlement amounts were as predicted by the 1986 O'Brien report. (Pl.Exh. 15, at 5; List Aff.Exh. A).

On May 20, 1991, Alta Engineering rendered another opinion to Trammel Crow on the general condition of the building, observing that the settlements "seem to exceed the magnitude as predicted by the [1986 O'Brien] report" and were caused by "poor soil strata." (Pl.Exh. 9). That month, during the period of the third insurance policy, Trammel Crow reported serious settlement damage at the building to the Boston Company for the first time; in some places, the building had settled as much as 18 inches. (Ianetta Aff. para. 7–8; Pl.Exh. 12; Ianetta Dep. p. 11.). Although Trammel Crow was required to

---

**3.** The provision in the purchase and sales agreement read:

"Except as expressly set forth to the contrary herein, all the representations, warranties, covenants and agreements of Seller, as well as any rights and benefits of Purchaser with respect thereto, shall survive the Closing for a period of three (3) years and shall not be merged into the Closing. Any claim or action with respect to any such representation, warranty, covenant or agreement must be asserted prior to the expiration of the three (3) year period...."
Cobb Aff.Exh. A, Art. XV, sec. 15.2.

report maintenance expenses on a monthly basis, (Def.Ex. 150), it did not report the money spent to repair settlement damage for the tenant until after May 1991. (Ianetta Aff., para. 6).

In the summer of 1991, the Boston Company hired engineers to review the settlement damage; they concluded that the rate of settlement had slowed to a "creep-like" pace. (Def.Ex. 39; TSC Dep. at 96–100; Ianetta Aff. para. 13; Machalinski Dep. at 95–96, 106). Believing their settlement troubles had ended, the Boston Company spent approximately $600,000 on improvements to the building. (Ianetta Aff. para. 14).

Unfortunately, new engineering reports in the summer of 1992 indicated that the building continued to settle—at an estimated rate of one inch per year. (Def.Ex. 40; Ianetta Aff. para. 15). In June 1992, Boston Company's asset manager for the building reported the settlement damage to the company's in-house insurance coordinator. (Ianetta Aff. para. 16; Mitchelson Aff. at 7). The coordinator then submitted a claim with Home Insurance. (*Id.* at 6). The insurance company sent an adjustor to visit the site. (Smith Dep. at 36).

Home Insurance denied the Boston Company's claim in March 1993. In its letter of denial, Home Insurance provided three independent reasons for rejecting the claim: 1) the Boston Company's loss was not fortuitous; 2) the faulty workmanship exclusion; and 3) the settlement exclusion. (Def.Ex. 85).

## DISCUSSION

### A. *Governing Standards*

Under Count I for breach of contract, Home Insurance advances four basic arguments in support of summary judgment. First, Home Insurance maintains that the exclusionary clauses in their policies place the Boston Company's loss outside the bounds of coverage. Second, it contends that the plaintiff's suit is time-barred. Third, Home Insurance argues that the plaintiff's failure to provide notice and proof of loss precludes its claim. Finally, Home Insurance contends that the settlement damage

was not fortuitous, and therefore not coverable by insurance. Because the court concludes that Home Insurance prevails on its first argument, the court will not address the remaining arguments.

A motion for summary judgment must be granted if:

[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990). "If this is accomplished, the burden then 'shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmoving party].'" *Febus–Rodriguez v. Betancourt–Lebron*, 14 F.3d 87, 91 (1st Cir.1994), quoting *Rogers v. Fair*, 902 F.2d at 143. Mere allegations are insufficient to defeat a summary judgment motion; rather, "the nonmoving party must adduce specific, provable facts which establish that there is a triable issue." *Febus–Rodriguez v. Betancourt–Lebron*, 14 F.3d at 91.

In a diversity case such as this, the court "must apply the choice of law rules of the state in which the court sits." *Brennan v. Carvel Corp.*, 929 F.2d 801, 806 (1st Cir. 1991). Accordingly, under Massachusetts law, the law of the jurisdiction with the "most significant relationship" to the transaction governs the dispute. *See id.* (Massachusetts courts apply the "most significant relationship" test in determining choice of law). *Accord Bi–Rite Enterprises Inc. v. Bruce Miner Co.*, 757 F.2d 440, 442 (1st Cir.1985). In determining the "most significant relationship," the Supreme Judicial Court has delineated a list of factors for resolving the choice of law issue. *Bushkin Associates, Inc. v. Raytheon, Co.*, 393 Mass. 622, 632, 473 N.E.2d 662 (1985). These factors include "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject

matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id.*

As both parties agree, Massachusetts is the jurisdiction with the "most significant relationship" to the transactions: the insurance policies were negotiated, issued, and to be performed in Massachusetts. *Id.* (applying the most significant relationship analysis to a contract case).

### B. *Insurance Policy Exclusions*

■ Home Insurance argues that the exclusionary clauses for settlement damage and faulty workmanship in the first two insurance policies preclude coverage for Boston Company's loss. Home adds that the "earth movement" endorsement included in each of the policies does not cover the type of damage sustained at 1501 Mittel Boulevard.

### 1. Settlement Exclusions

The first and second insurance policies contained exclusions for:

"damage caused by or resulting from ...
12. faulty workmanship, material, construction, or design from cause, unless physical damage not otherwise excluded from this policy results in which event, this Policy will cover only such resulting damage;
14. settling, cracking, shrinking, bulging, or expansion of pavements, foundations, walls, floors or ceilings;"

(Def.Ex. 109).

In interpreting a similar settlement exclusion, the Supreme Judicial Court held that only settlement damage from unanticipated or sudden forces falls outside the scope of such exclusions. *See Todisco v. National Fire Ins. Co. of Hartford,* 356 Mass. 736, 736–37, 254 N.E.2d 787, 788 (1970) (where the insured's foundation was damaged by a heavy rainfall, the exclusionary clause applied because "... a periodic weather condition such as a heavy rainfall is a natural force which cannot be considered an unanticipated event or a 'sudden force' ").

Similarly, in Illinois such settlement damage exclusions are construed to preclude coverage for gradual foundational damage. *La-Salle National Bank of Chicago v. American Ins. Co.,* 14 Ill.App.3d 1027, 1031, 303 N.E.2d 770, 774 (1973). The facts of *LaSalle* are "strikingly similar" to those in the present case. As with Boston Company's property, the one story commercial building in *LaSalle* suffered serious, gradual settlement damage as a result of underlying soil compression. Based on the gradual nature of the damage in *LaSalle,* the court characterized the insured's loss as settlement (excluded) rather than sudden collapse (covered). *Id.*

Other jurisdictions have reached similar conclusions. *See Krug v. Millers' Mutual Ins. Assoc. of Illinois,* 209 Kan. 111, 114–17, 495 P.2d 949, 953–54 (1972) (foundational damage caused by water leakage still within settlement exclusion rather than collapse); *Nida v. State Farm Fire & Cas. Co.,* 454 So.2d 328, 330–36 (La.Ct.App.) (damage due to shrinkage and expansion of clay soil was settlement, not collapse), *cert. denied,* 458 So.2d 486 (La.1984); *Brodkin v. State Farm Fire & Cas. Co.,* 217 Cal.App.3d 210, 217–18, 265 Cal.Rptr. 710, 713–14 (1989) (corrosion of foundation due to soil contamination is excluded by settlement exclusion), *reh'g denied,* (Mar. 29, 1990). *But see Barash v. Ins. Co. of No. America,* 114 Misc.2d 325, 451 N.Y.S.2d 603, 606 (Sup.Ct.N.Y.1982) (settlement exclusion inapplicable where foundation collapse impaired structural integrity of house rendering it uninhabitable); *Ariston Airline Catering & Supply Co., Inc. v. Forbes,* 211 N.J.Super. 472, 511 A.2d 1278, 1286 (1986) (foundational damage caused by flooding waters which resulted in frost heaving was outside the settlement damage exclusion because they were caused by an external force).

With respect to the settlement damage provisions in the first and second policies (September 1988—September 1990), the undisputed evidence demonstrates that the damage to the building was caused by factors such as gradual soil compression and/or design defect rather than "sudden forces."

Additionally, the change in policy language from the first two policies (excluding "settlement") to the second two policies (excluding only "normal settlement") lends credence to the conclusion that all settlement is excluded

**374**

under the first and second policies. *See Lumbermens Mutual Casualty Co. v. Belleville Industries, Inc.,* 407 Mass. 675, 682–83, 555 N.E.2d 568 (1990) (noting that changes in policy language may be instructive in construing policy language). Accordingly, the settlement loss falls within the exclusion under the first and second policies.

### 2. Earth Movement Endorsement

 Boston Company contends that the earth movement endorsements in the first and second policies extend coverage to this damage. There is no Massachusetts precedent on whether earth movement clauses include settlement damage, but the clear majority of other jurisdictions reject such a notion. Most courts have confined the meaning of "earth movement" to its commonplace usage—referring only to sudden, cataclysmic events (e.g., earthquakes). *Mattis v. State Farm Fire & Cas. Co.,* 118 Ill.App.3d 612, 617, 73 Ill.Dec. .907, 911, 454 N.E.2d 1156, 1160 (1983) (settlement caused by placement of backfill material against basement wall not considered earth movement); *Burton v. State Farm Fire & Cas. Co.,* 533 F.2d 177, 179 (house damaged by falling into a limestone sinkhole found within earth movement exclusion), *reh'g denied,* 540 F.2d 1084 (5th Cir.1976); *Wyatt v. Northwestern Mutual Ins. Co. of Seattle,* 304 F.Supp. 781, 782–84 (D.Minn.1969) (earth movement exclusion did not apply where actions of third party caused earth movement).

When earth movement clauses contain the word "subsidence" (as in the instant case), a few courts have construed them somewhat more broadly to include events with non-natural causes. *See Village Inn Apartments v. State Farm Fire & Cas. Ins.,* 790 P.2d 581, 583 (Utah Ct.App.1990) (eight inch settlement caused by ruptured underground waterpipe excluded by earth movement exclusion); *Millar v. State Farm Fire & Cas. Co.,* 167 Ariz. 93, 96–97, 804 P.2d 822, 825–26 (App.1990). (earth movement exclusion applied to rapid soil collapse due to water leaking from a sprinkler system).

Even this more expansive interpretation of earth movement clauses is not broad enough to encompass the damage to Boston Compa-

ny's building as it was neither sudden nor caused by non-natural forces.

### C. *Count II: M.G.L. c. 93A*

In Count II, Boston Company alleges that Home's denial of coverage constituted an unfair or deceptive business practice under G.L., c. 93A, § 11. Because denial of coverage was proper, the court grants summary judgment on Count II.

### ORDER

The motion for summary judgment is *ALLOWED* on Counts I and II with respect to claims under the first and second insurance policies.